This transcript was exported on Jan 17, 2024 - view latest version here.

**EXHIBIT DAR016**

Speaker 1 (00:00):

Yes, thank you. Yes.

Speaker 2 (00:02):

Alright, good afternoon. My name is Dave Waer. I'm the interim trustee appointed in the Sanders bankruptcy case. Um, it's the only case we have on today's docket. The case number is 23 dash 4 8 59. My counsel, Simon Rodriguez, is also here on the Zoom. Um, before today, Ms. Riley sent me copies of Mr. Sanders, Mississippi driver's license and his social security card, which I'm looking at right now. The image on the, uh, on the license matches who I see on the screen and the name matches the filing and the social security number matches the filing. So we've confirmed identity. Um, I think the way this is gonna work is I'm gonna ask a handful of preliminary questions. Mr. Rodriguez is gonna follow up with some more detailed questions about your schedules, and then I expect that, uh, some of the creditors on the line will have some questions as well. So, Mr. Sanders, you please raise your right hand. Do you swear or affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

Speaker 3 (00:59):

Yes.

Speaker 2 (01:00):

Please state your name.

Speaker 3 (01:02):

Shiloh Sanders.

Speaker 1 (01:03):

And this is Carrie Riley appearing on behalf of Mr. Sanders. Um, also appearing on behalf of Mr. Sanders. We also have Jim Van Horn and Victor Vial. Uh, and Ms. Plummer is here on some of, uh, Mr. Sanders business related matters as well.

Speaker 2 (01:18):

Okay, very good. And I met with, I miss Mr. Van Horn and Mr. Vital before we started, um, Mr. Sanders, the address you have on file with the court is actually a PO box in Longmont. Is that an, is, are you getting mail there from this case?

Speaker 3 (01:32):

Um, I have. Haven't <inaudible>?

Speaker 4 (01:35):

Well, the answer is yes. I've, I've seen it,

Speaker 1 (01:38):

So,

**EXHIBIT DAR016 - Page 1**

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (01:38):

Yes. Okay. Ms. Plummer, you are not the debtor or under oath, so I would ask you not to answer any of the questions.

Speaker 4 (01:44):

Okay. Apologies.

Speaker 2 (01:46):

Um, and mute your phone until, uh, until you're called on. Um, so Mr. Sanders, you haven't received any mail at that address since the case was filed?

Speaker 3 (01:55):

Uh, I haven't picked up any mail from, from there, but, all right. I'm not sure what mail comes from from there, what mail doesn't,

Speaker 2 (02:04):

Where do, I don't want the actual street address, but where do you reside? What city? In Boulder. In Boulder. Alright. Um, Carrie, do you know if that PO box is a good PO box? I mean, is that, are you able to, if the PO

Speaker 1 (02:19):

Box? Yeah. So the PO box is a good PO box. It's my understanding that, uh, Mr. Sanders does have somebody else collecting his mail for him, generally.

Speaker 2 (02:27):

Okay. Um, Mr. Sanders, did you sign all of the bankruptcy documents, the petition, the statement of financial affairs and the schedules,

Speaker 1 (02:37):

These documents?

Speaker 3 (02:38):

Yes.

Speaker 2 (02:39):

And did you sign 'em all before the bankruptcy case was filed?

Speaker 3 (02:44):

Um, I'm not exactly sure.

Speaker 2 (02:47):

Did you sign 'em, did you sign 'em and then authorize Ms. Riley to file their case, file your case?

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 (02:54):

Did I do what?

Speaker 2 (02:54):

Did you sign the documents and then authorize Ms. Riley to file the case on your behalf?

Speaker 3 (02:59):

Oh yeah.

Speaker 2 (03:01):

Um, did you carefully review the documents before you signed them?

Speaker 3 (03:07):

Yes.

Speaker 2 (03:09):

Do you have personal knowledge of all the information that Ms. Riley input into those forms?

Speaker 3 (03:14):

Yes.

Speaker 2 (03:16):

To the best of your knowledge, is the information all true and correct?

Speaker 3 (03:20):

Yes.

Speaker 2 (03:21):

And I noticed you filed some, uh, amendments this morning. So with those amendments, Mr. Sanders, everything is true and correct?

Speaker 3 (03:28):

Yes sir.

Speaker 2 (03:28):

Do you believe you've listed all of the assets that you own?

Speaker 3 (03:33):

Uh, yes, at the moment I definitely believe they're that.

Speaker 2 (03:35):

And do you believe you've listed all your debts?

EXHIBIT DAR016 - Page 3

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 ([03:40](#)):

Uh, I'm not exactly sure.

Speaker 1 ([03:44](#)):

There may be some other personal obligations that we need to have been to identify as well.

Speaker 2 ([03:48](#)):

Okay. As of right now, I think you've listed potential tax debt and then two unsecured creditors. Does that sound right?

Speaker 3 ([03:53](#)):

Yes. Yeah.

Speaker 2 ([03:54](#)):

Um, uh, other than what you've already changed, or I guess you, you've made some changes, are there any other changes other than maybe adding some more creditors that you anticipate?

Speaker 3 ([04:04](#)):

Uh, not at the moment. I'm not too entirely sure, but we'll communicate that if if it comes up.

Speaker 2 ([04:13](#)):

Have you filed bankruptcy before?

Speaker 3 ([04:16](#)):

No, never.

Speaker 2 ([04:17](#)):

Did Ms. Riley show you the information sheet that lists the different chapters? You can file a bankruptcy under

Speaker 3 ([04:22](#)):

Different chapters,

Speaker 2 ([04:23](#)):

Like 11, 7 13?

Speaker 3 ([04:26](#)):

Oh yeah. Yes.

Speaker 2 ([04:27](#)):

Um, do you owe anyone a domestic support obligation, like child support or alimony?

Speaker 3 ([04:32](#)):

**EXHIBIT DAR016 - Page 4**

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

No, I don't have any kit.

Speaker 2 (04:34):

Gary, I didn't get that form from you. Did, did you, do you think you sent that?

Speaker 1 (04:38):

Uh, I thought I uploaded it to Stretto, but we'll get that taken

Speaker 2 (04:40):

Care of today. If you can do that today, that'd be ideal. Um, yes. You

Speaker 3 (04:43):

Just scared me.

Speaker 2 (04:45):

What'd you say?

Speaker 3 (04:47):

You just scared me. <laugh>, you know, some details. Right,

Speaker 2 (04:50):

Right. Um, uh, Ms. Riley gave me a copy of your 2022 Federal tax return. Is that a true copy of the last return you filed?

Speaker 3 (04:59):

Uh, yes, it should be.

Speaker 2 (05:01):

Um, and then you are, are you a full-time student? I guess tell me your, tell me your sort of, uh, how you're employed or, or not employed right now.

Speaker 3 (05:11):

So right now I am in college. I go to University of Colorado right now and I play football. So everything is really just around football.

Speaker 2 (05:24):

Okay. Alright. I'm gonna pause for now. Mr. Rodriguez, do you want to jump in here?

Speaker 5 (05:29):

Yes. Thank you Mr. Wadsworth. Um, uh, Mr. Sanders, my name is Simon Rodriguez and I have been a, um, been retained by Mr. Wadsworth to assist him in this bankruptcy filing. And I have a series of questions that I will be asking you today. And in no way am I trying to mislead you or, or any of these questions being trick questions or anything like that. And so if for some reason you don't understand my

EXHIBIT DAR016 - Page 5

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

questions question, just ask me and I'll try to, uh, ask the question in a way that you can understand and also feel free to consult with your attorney at any time that you're not sure about your responses.

Speaker 3 (06:08):
Okay? Thank you.

Speaker 5 (06:09):
With regard to your, um, your, your, uh, uh, Colorado, uh, university of Colorado student athlete, do you maintain any eligibility?

Speaker 3 (06:21):
Yes, I have one more year of eligibility left and I'm getting my master's degree.

Speaker 5 (06:27):
And so you intend to fulfill that last year of eligibility?

Speaker 3 (06:31):
Yes.

Speaker 5 (06:32):
So you have no intention of declaring for the NFL draft?

Speaker 3 (06:36):
I mean, whatever Coach Prime say, if he just changed his mind, you know, I would love go.

Speaker 5 (06:42):
But right now your intention is to, um, to fulfill your last year of eligibility?

Speaker 3 (06:48):
Yes.

Speaker 5 (06:49):
And would that be at the University of Colorado?

Speaker 3 (06:52):
Yes.

Speaker 5 (06:53):
And prior to the University of Colorado, um, did you have any other student eligibility, athletics?

Speaker 3 (07:00):
Did I play anywhere else?

EXHIBIT DAR016 - Page 6

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

**Speaker 5** (07:01):

Yes.

**Speaker 3** (07:03):

Yes, I played at two different schools. Do you wanna know those?

**Speaker 5** (07:06):

And what were those schools?

**Speaker 3** (07:09):

I'd say the first school I went to was South Carolina,

**Speaker 5** (07:13):

The University of South Carolina and Columbia.

**Speaker 3** (07:16):

Yeah. Then the second school I went to was Jackson State.

**Speaker 5** (07:21):

And where's Jackson State? Located

**Speaker 3** (07:24):

In Jackson, Mississippi.

**Speaker 6** (07:26):

I,

**Speaker 5** (07:31):

And, um, I, I do have a lot of questions, so bear with me if, if there's any pauses, it's just me taking notes. Okay. Um, in your bankruptcy, you disclosed, um, some monthly income of about $50,000 a month and, uh, some expenses of about five or $6,000 a month leaving, or maybe $10,000. So how long has that $50,000 a month income? How long have you received that income?

**Speaker 3** (08:05):

I'm not on a steady salary or anything like that. And, um, basically they just looked at my, um, income and came up with the average of it, or it's not like a set 50,000 a month I would make, you know.

**Speaker 5** (08:21):

So you average, is that correct?

**Speaker 3** (08:25):

I assume it's the average of that, yeah, but it's not every month. I, I don't just, here's 50,000, like one month I can make nothing. The next month it might be like that just 'cause NIL deals.

**EXHIBIT DAR016 - Page 7**

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (08:37):

Okay. And then just for the purposes of the record, what does NIL stand for?

Speaker 3 (08:43):

Name, image, likeness.

Speaker 5 (08:45):

Okay. And we will get to that in a moment, but, so with regard to the average monthly income, what was the lookback period that you used to what that monthly average was? Was it three months, six months, 12 months, a year? Two years?

Speaker 1 (09:04):

If you remember.

Speaker 3 (09:05):

I'm not, I don't, I don't, I'm not sure. I don't remember that.

Speaker 5 (09:08):

Okay. So did somebody help you, uh, with the, um, the calculation of that monthly income?

Speaker 3 (09:16):

Somebody helping me with the calculation?

Speaker 5 (09:18):

Yes.

Speaker 1 (09:19):

Basically who helped develop the forms?

Speaker 3 (09:21):

Oh yes.

Speaker 5 (09:22):

And who was that? Who was that person or entity?

Speaker 3 (09:27):

Ms. Carrie. But there's a,

Speaker 1 (09:30):

And, and don't talk about communications between us. Um, and there were also some additional administrative personnel that assisted as well. Uh, ms. Oh, I don't remember the Jordy's last name.

Speaker 3 (09:43):

EXHIBIT DAR016 - Page 8

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Ms. George.

Speaker 1 (09:45):

Um, uh, so Mr. Sanders's assistant did assist with that as well? Uh, as did Ms. Plumber.

Speaker 5 (09:50):

Thank you. Now you also list some, some interest in some LLCs. One of them is called Big 21 LLC. Are you familiar with that LLC?

Speaker 3 (10:04):

Yes, sir.

Speaker 5 (10:05):

What state is that in? Um, uh, establishment.

Speaker 3 (10:10):

I'm not too entirely sure because I don't want to give you the wrong answer. I just don't know a hundred percent.

Speaker 5 (10:16):

Okay, that's fair. Are you the only member of that LLC or are there other members?

Speaker 3 (10:22):

Uh, I should be the only member.

Speaker 5 (10:27):

Um, getting back to your, your income, the monthly income, is that money paid to you directly or is it paid to The LLCs?

Speaker 3 (10:36):

To the LLCs.

Speaker 5 (10:38):

Okay. Uh, the big 21 LLC, does it have bank accounts?

Speaker 3 (10:44):

Uh, I think that's, oh yeah, yeah, there's bank accounts under that. So there's just one bank account under that though.

Speaker 5 (10:52):

And, and who is the banking entity?

Speaker 3 (10:56):

EXHIBIT DAR016 - Page 9

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Big two one LLC.

Speaker 1 (10:57):

Uh, it's through Wells Fargo.

Speaker 5 (10:58):

Wells. Thank you. So, um, Ms. Sanders, Ms ms. Um, Riley's not under oath that she gave an a a, a response to that question. You agree that the bank accounts with Wells Fargo?

Speaker 3 (11:11):

Yes, Wells Fargo, I'm sorry, I didn't understand what you were saying.

Speaker 5 (11:14):

No, that, that's fine. And then does Big 21 LLC have debt?

Speaker 3 (11:20):

I'm not exactly sure.

Speaker 1 (11:23):

So does it owe counsel or attorneys?

Speaker 3 (11:26):

Oh yeah.

Speaker 5 (11:29):

And do you have an idea Rus? Um, um, how much debt the company may have?

Speaker 3 (11:36):

I'm not too entirely sure about everything, but as of right now, what's on the, what's on the paper

Speaker 1 (11:45):

And we can provide the information on the company's debts as well. There are some outstanding invoices owed to accountants, uh, and I believe Ms. Ms firm as well.

Speaker 5 (11:54):

So thank you again. Um, with regard to the debt, is that debt that gets paid every month or is it a debt, debt that's being accumulated by the company and not being paid?

Speaker 3 (12:05):

Well, that was being accumulated by the company and I usually pay all that stuff during the same time of the, the year, like, you know, at the end or when it's time to do taxes.

Speaker 5 (12:17):

EXHIBIT DAR016 - Page 10

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

So then

Speaker 3 (12:17):

I'll everything with my, with my team.

Speaker 5 (12:20):

So do you pay the, the, your, your, your bills and invoices at the end of the month? Every 90 days? How, how does that work?

Speaker 3 (12:31):

Usually around the time I do taxes and stuff,

Speaker 5 (12:34):

So once a year

Speaker 3 (12:36):

I, I'd say probably, probably. So it's different for different people though.

Speaker 5 (12:46):

Um, and does the LLC have employees? The big 21 LLC?

Speaker 3 (12:53):

Yes. I'm not exactly sure who's employee.

Speaker 5 (12:57):

How many employees does the company have?

Speaker 1 (13:00):

Like do you have like W2 employees?

Speaker 5 (13:03):

No, I don't have any

Speaker 3 (13:04):

Employees. No W2 employees. But

Speaker 5 (13:07):

Does the, so, so lemme make sure I understand your response. The, the company does not have W2 employees.

Speaker 3 (13:15):

I'm not gonna lie, you guys are saying some stuff I've never heard of right now,

EXHIBIT DAR016 - Page 11

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (13:19):

<laugh>. Okay. No, that's, I trying

Speaker 3 (13:21):

To trip you up or give you the wrong question, but I'm trying my best to answer this stuff.

Speaker 5 (13:25):

No, totally fair here. Um, does the company contract with, I mean the LLC, does it contract with people to it in performing your services?

Speaker 3 (13:38):

Yeah.

Speaker 5 (13:39):

And how many people do they, does the company, uh, employ to do that?

Speaker 3 (13:45):

Um, I'd say there's a lot of different people. I'm not sure exact the number, but I definitely need to do

Speaker 5 (13:53):

That. Does it vary by month?

Speaker 3 (13:57):

Um, I'm not too entirely sure.

Speaker 5 (14:02):

Okay. Is it like one person, two people, 10 people?

Speaker 3 (14:08):

I want to, can I ask you a question?

Speaker 5 (14:11):

Well, I, I'm asking the questions here, so,

Speaker 3 (14:14):

Because I'm trying to clarify like exactly, but

Speaker 1 (14:17):

Um, it, hold on just a second. It, let, let me see if I can help and we'll, we can back on it just a second.

Speaker 5 (14:54):

That's <inaudible>.

EXHIBIT DAR016 - Page 12

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 (14:55):

Okay. Um, so if I can assist here, and Mr. Sanders can correct me if I'm wrong. Um, there are people who assist in providing services such as, you know, stylist Hairstylists, uh, Mr. Sanders assistant, but there are no employees or 10 99 contract employees.

Speaker 5 (15:13):

So again, Mr. Sanders, your, your attorney's not under oath, but she's given a, a response to my question. Do you agree with that response?

Speaker 3 (15:21):

Yes. That's what we, I just said off the correct.

Speaker 5 (15:25):

Okay. Now, um, do you have another company called SS 21 LLC? Do you know what state that entity is established in?

Speaker 3 (15:37):

Uh, I haven't seen that one in a long time.

Speaker 5 (15:40):

Is it? I'm not sure a business that's operational.

Speaker 3 (15:43):

I'm not sure what state that's under.

Speaker 5 (15:46):

Okay. But it's, it's a, it's a business that's an, it's an ongoing business.

Speaker 1 (15:52):

Does that business do anything?

Speaker 3 (15:55):

I don't know. I'm not even gonna lie. I don't know.

Speaker 5 (15:58):

Okay. Let me step back, back to big, big, big 21 LLC. What does Big 21 LLLC do?

Speaker 3 (16:14):

Uh, just business stuff.

Speaker 5 (16:16):

Well explain what the business is.

EXHIBIT DAR016 - Page 13

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 ([16:20](#)):

It is pretty broad. 'cause I, I do a lot of things with that, with that business. Um, tell

Speaker 5 ([16:26](#)):

Me what it is.

Speaker 3 ([16:29](#)):

Like just examples of certain things?

Speaker 5 ([16:30](#)):

Yes.

Speaker 3 ([16:32](#)):

Um, probably commercial, probably like any deals.

Speaker 5 ([16:42](#)):

What do you mean deals? You can be specific on what it does.

Speaker 3 ([16:47](#)):

All right. Let's say commercials, YouTube like videos and stuff, I'd say.

Speaker 1 ([16:58](#)):

What about your NIL deals?

Speaker 3 ([16:59](#)):

Yeah, NIO in total, but all, all of that is like commercials or advertising, stuff like that.

Speaker 5 ([17:06](#)):

And so all the NIL deals, YouTube deals. Do you do stuff Instagram,

Speaker 1 ([17:13](#)):

Like Instagram apps stuff

Speaker 3 ([17:15](#)):

Or Instagram? No.

Speaker 5 ([17:18](#)):

Um, do you do TikTok?

Speaker 3 ([17:21](#)):

Oh, you talking about do I post on TikTok?

Speaker 5 ([17:24](#)):

**EXHIBIT DAR016 - Page 14**

This transcript was exported on Jan 17, 2024 - view latest version here.

Right. And do you get paid for those posts?

Speaker 3 (17:28):
Not from Instagram or TikTok,

Speaker 5 (17:31):
But from people who ask you to post, you'll get paid?

Speaker 3 (17:35):
Yeah. But it is not from like Instagram or TikTok. No, I

Speaker 5 (17:38):
Understand that. I understand that. I'm just asking if you use those platforms. Instagram, TikTok, YouTube.

Speaker 3 (17:46):
Yeah, I make posts on, I make posts on Instagram. TikTok not really that much on YouTube, but,

Speaker 5 (17:53):
And now, and then your NIL deals and commercials. And those are all run through Big 21 LLC?

Speaker 3 (18:02):
I think so.

Speaker 5 (18:03):
Okay. Again, I'm not here to try to trick you, mislead you or anything like that. Um, and then do you have the same type of items running through SS 21 LLC or is that I'm not completely different company.

Speaker 3 (18:19):
I'm not too entirely sure what runs through that.

Speaker 5 (18:23):
Okay. And you don't, I I, i I don't recall what your response was. What state is that LLC um, organized under?

Speaker 3 (18:34):
I don't recall either.

Speaker 5 (18:36):
Okay. And does that have who, uh, are you the sole member of that LLC or are there other members?

Speaker 3 (18:44):
I'm not sure if I'm a member or an owner. I'm not sure. So I don't know the terms.

EXHIBIT DAR016 - Page 15

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (18:49):

Okay, go ahead. So does anyone else have an interest besides you and that company?

Speaker 3 (18:55):

An interest?

Speaker 5 (18:56):

Look, does anybody else have an own? Yes, that's 21.

Speaker 3 (19:00):

I have no clue. I'm not, I'm not too entirely sure. I don't wanna give you the wrong answer.

Speaker 5 (19:06):

Okay. And so for both of these companies, you maintain records on who are the members, what their ownership interests there are and the like. Is that true?

Speaker 3 (19:17):

Say that one more time. I'm sorry.

Speaker 5 (19:19):

So the, the, you maintain business records that show the ownership interests of these companies. Is that true?

Speaker 3 (19:28):

I'm not sure. I I'm not exactly sure. Do you hire

Speaker 5 (19:32):

People to help them?

Speaker 3 (19:33):

Yeah.

Speaker 5 (19:34):

So, so you personally,

Speaker 3 (19:36):

I'm not sure.

Speaker 5 (19:37):

So, so if we, if we make the request to get those documents, it's within your, to get those documents correct.

Speaker 3 (19:46):

EXHIBIT DAR016 - Page 16

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

To get those documents

Speaker 5 (19:47):
Correct?

Speaker 3 (19:49):
Yeah, I can probably ask. I can't probably be by myself. I probably don't know how.

Speaker 5 (19:53):
Okay. Well that's something that you and your attorney can discuss because we're probably gonna make a request for those, for those documents. Okay. Does SS 21, uh, do you know when that company was formed?

Speaker 3 (20:08):
Not exactly. Sure.

Speaker 5 (20:10):
Okay. What about Big 21 LLC? Do you know when that company was formed?

Speaker 3 (20:15):
Not sure.

Speaker 5 (20:16):
Okay. Uh, do you have any accounts up any banking accounts outside the United States?

Speaker 3 (20:24):
No.

Speaker 5 (20:25):
Are you the beneficiary of any trust?

Speaker 3 (20:29):
Yes.

Speaker 5 (20:30):
And, uh, under whose trust?

Speaker 3 (20:34):
Uh, it was a trust when I was, it was my mom's trust

Speaker 5 (20:41):
And that and and do you receive income from that trust?

EXHIBIT DAR016 - Page 17

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 ([20:45](#)):

No, I don't receive any income from, I just kept investing it.

Speaker 5 ([20:54](#)):

So do you place money into that trust?

Speaker 3 ([20:59](#)):

The trust was with Charles Schwab and I wanted to use a different platform to invest it, so I switched it.

Speaker 1 ([21:06](#)):

So just to be clear and translate the trust corpus, which was really funds at that point, uh, are the funds that were then in the Robin Hood account?

Speaker 5 ([21:18](#)):

So the Robin Hood accounts is in, in your mother's name or in your name

Speaker 3 ([21:23](#)):

Is in my name, but I think she's the benefic. I don't know how to even, I'm not about to jack up that word, but she is on that account. Like if something happens to me, then it's her.

Speaker 5 ([21:36](#)):

Um, so if you were to die, your mother would get, she would be the payable on death or does she have access to that account?

Speaker 3 ([21:46](#)):

Uh, I'm not really sure of the terms, but I know she's on there though. I put her on there.

Speaker 1 ([21:51](#)):

We can get you some more information on that to clarify that.

Speaker 5 ([21:54](#)):

Okay. The Mercedes, when did you get the Mercedes?

Speaker 3 ([21:58](#)):

I got it earlier this year,

Speaker 5 ([22:00](#)):

Like in August, September, March, April.

Speaker 3 ([22:06](#)):

See, I'm not trying to mess you up and give you the wrong date, but for sure it was earlier part of this year. 2023.

EXHIBIT DAR016 - Page 18

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (22:13):

Okay. And that is a, a, an automobile that is financed?

Speaker 3 (22:17):

Yes.

Speaker 5 (22:18):

And it's insured? Yeah. Now, uh, is that the only vehicle you have?

Speaker 3 (22:27):

That's not the only car that I have. Okay. That's the only car that I own.

Speaker 5 (22:32):

Uh, so you what do you mean that you own?

Speaker 3 (22:38):

Like, that's the only car under my name.

Speaker 1 (22:40):

So what's the other vehicle that

Speaker 5 (22:41):

You just referenced? And that was my next question is, what other vehicles do you have?

Speaker 3 (22:46):

I have a truck.

Speaker 5 (22:48):

What kind of truck?

Speaker 3 (22:51):

It is a Ram A a Ram truck.

Speaker 5 (22:55):

A Dodge Ram. And is that something that is loaned to you or is that something you lease? Is that something you purchase?

Speaker 3 (23:03):

That's the one my dad helped me get that car.

Speaker 5 (23:07):

And what do you mean that your dad helped you get that car?

EXHIBIT DAR016 - Page 19

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 (23:10):

Like he, he bought the car and then I just drive it. But he's, um, it's for, it is actually, it's paid off everything

Speaker 5 (23:24):

And it's, and and it is titled in your father's name?

Speaker 3 (23:28):

Yeah.

Speaker 5 (23:29):

So you have no ownership interest, you just have a used interest.

Speaker 1 (23:34):

You have to answer

Speaker 3 (23:35):

You. Oh, I'm sorry. I'm sorry. I'm just thinking wrong. FaceTime right now. I'm sorry. I'll say, um, yeah, I could just drive it and stuff. I don't own it. It, it is. And I have one more car.

Speaker 5 (23:49):

And what is that vehicle?

Speaker 3 (23:51):

It was a CLA two 50. It's getting serviced right now in Jackson, Mississippi.

Speaker 5 (23:57):

A CLA two 50. Is that a Mercedes?

Speaker 3 (24:00):

Yes.

Speaker 5 (24:02):

And that's a vehicle, uh, that you own or that you're buying? Yeah. Car. You're leasing. What, what's the, how, how's that vehicle?

Speaker 3 (24:14):

That car is paid off, but it is really messed up right now, so I don't know if it has insurance and all that right now. I don't think it does.

Speaker 5 (24:23):

Okay. What year is that vehicle?

EXHIBIT DAR016 - Page 20

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 ([24:27](24:27)):

That year is 2015.

Speaker 5 ([24:32](24:32)):

And it is being serviced in Mississippi right now.

Speaker 3 ([24:35](24:35)):

Good.

Speaker 5 ([24:35](24:35)):

Where in Mississippi?

Speaker 3 ([24:38](24:38)):

Jackson, Mississippi At Mercedes in Jackson, Mississippi.

Speaker 5 ([24:42](24:42)):

When was that taken for service?

Speaker 3 ([24:48](24:48)):

That car's been there since December of last year.

Speaker 5 ([24:52](24:52)):

Okay. And you've made no effort to get it back?

Speaker 3 ([24:55](24:55)):

Yeah, I haven't, but they have so many cars up there and I used to know the, the GM up there and he was just gonna get everything fixed on it, but he was like, Hey, gimme a second. But then I guess they just forgot about it and I moved so I wasn't really in no rush to get it 'cause I moved to Colorado.

Speaker 5 ([25:15](25:15)):

Okay, but it's your intention to still get it back?

Speaker 3 ([25:18](25:18)):

Yes. Okay. They, they should be doing service on it now.

Speaker 5 ([25:22](25:22)):

So earlier, uh, Mr. Wadsworth asked you about all your assets being, uh, listed on the bankruptcy and now we've figured at least one asset. Um, is there anything else that you're now remembering that you want to tell us that you forgot and you wanna make sure that you have a clean record on? Wait,

Speaker 3 ([25:43](25:43)):

What, what did you say

EXHIBIT DAR016 - Page 21

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (25:44):

Before that? So Mr. Wadworth earlier asked you if all your assets, everything you have was listed on the bankruptcy and you said that it was, but now we're learning that there may be some things that you forgot to list.

Speaker 3 (25:59):

Like what?

Speaker 5 (26:01):

So like, for example, the motor vehicle.

Speaker 3 (26:04):

Oh, that I own. I don't own, I only own one car.

Speaker 5 (26:08):

Well, the, the Mercedes in Jackson, Mississippi.

Speaker 3 (26:11):

Yeah. That's not owned by me.

Speaker 5 (26:13):

Who's it owned by?

Speaker 3 (26:15):

I don't know who's on that saddle, but it was from whoever they bought it from. 'cause my mom helped me get that. So wherever she bought it, she bought it from somewhere in Houston. And I just had to get all that information transferred over. But I was gonna let her drive that car though.

Speaker 5 (26:33):

So I got Did that vehicle purchase for your use?

Speaker 3 (26:38):

That's like, if you could ask me do you have any other vehicles? I would claim those, but they're not actual like that I own.

Speaker 5 (26:47):

Okay, but you don't know who owns the, the the 2015 Mercedes?

Speaker 3 (26:51):

No, I could, I could say I own the, um, GLE Mercedes. That's it. Or I'm finance in it. My name's under it. That's it. And that's the one you purchased in 2023, right? Yeah, I I I don't want the other one that shouldn't be added to things that I own.

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (27:07):

So again, you're, you're, you're confusing me with these vehicles. The 2015 Mercedes that's in Jackson, Mississippi. Who owns that vehicle?

Speaker 3 (27:16):

I don't know exactly who owns it, but

Speaker 5 (27:19):

How did it come into your possession?

Speaker 3 (27:22):

Because we bought it.

Speaker 5 (27:23):

Who's we?

Speaker 3 (27:25):

My mom bought it, I think, but she helped me get it though.

Speaker 5 (27:35):

Okay. You bought it with her or she bought it in her name only?

Speaker 3 (27:40):

I am not exactly sure whose name it is under. I could find out, but it is not under my name for sure.

Speaker 5 (27:46):

And there's, so there's a loan that's on that vehicle,

Speaker 3 (27:51):

A loan

Speaker 5 (27:52):

Or is it outright paid for on the 2014

Speaker 3 (27:56):

That card paid for.

Speaker 5 (27:58):

Okay. Now do you, you, you use some social media platforms, is that correct?

Speaker 3 (28:04):

Yes.

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 ([28:05](https://)):

What are the social media platforms that you use?

Speaker 3 ([28:11](https://)):

Instagram, TikTok, um, threads and YouTube.

Speaker 5 ([28:35](https://)):

And you use these, um, to try to generate income from those, from that use?

Speaker 3 ([28:42](https://)):

Uh, no, that's not the purpose that I used those, I didn't create those pages for that.

Speaker 5 ([28:48](https://)):

So your Instagram, uh, how many followers do you have there?

Speaker 3 ([28:53](https://)):

Roughly? Post a million. Post a million.

Speaker 5 ([28:56](https://)):

And TikTok talk?

Speaker 3 ([28:58](https://)):

Uh, probably the 350,000. Not exactly 350,000, but around 350,000.

Speaker 5 ([29:06](https://)):

Yeah. I'm just asking for a ballpark estimate of and then threads, what kind of following there?

Speaker 3 ([29:12](https://)):

I'm not sure how many follows I have on Threads

Speaker 5 ([29:15](https://)):

And YouTube. Usually

Speaker 3 ([29:18](https://)):

Subscribers on YouTube?

Speaker 5 ([29:20](https://)):

Yes.

Speaker 3 ([29:22](https://)):

Uh, over a hundred K.

Speaker 5 ([29:24](https://)):

EXHIBIT DAR016 - Page 24

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

A hundred over 100 k. Is that yes or no?

Speaker 3 (29:29):

Yes. My bad.

Speaker 5 (29:30):

Again, when you nod your head it doesn't record, so you need to articulate.

Speaker 3 (29:34):

Just thinking we're on FaceTime right now, I apologize.

Speaker 5 (29:37):

Okay. Um, have you ever heard of the company on three?

Speaker 3 (29:45):

Yes.

Speaker 5 (29:47):

Okay. How do you know about On three?

Speaker 3 (29:50):

Um, because I've read articles by them.

Speaker 5 (29:54):

Okay. And, um, getting back to your social media platforms, have you ever done evaluation of how much those platforms may be worth?

Speaker 3 (30:04):

How much Instagram is worth

Speaker 5 (30:06):

All of them Before that you mentioned Instagram, TikTok Threads and YouTube. Have you done a valuation of what the value of those companies, those, um, uh, social platforms may be worth to you?

Speaker 3 (30:22):

Um, I'm an investor so I know about how much those companies are worth. So

Speaker 5 (30:28):

What do you think? What do you think that they're worth?

Speaker 3 (30:32):

I don't know exactly how much.

EXHIBIT DAR016 - Page 25

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 ([30:34](https://)):

Just to clarify, are we talking about Mr. Sanders accounts or like Instagram as a

Speaker 5 ([30:38](https://)):

Company? We're talking about the Instagram TikTok threads and, and YouTube because um, it seems like on three has an opinion there.

Speaker 1 ([30:49](https://)):

So how much are your accounts

Speaker 3 ([30:50](https://)):

Worth? Alright, I thought you were asking me how much is Instagram worth? That's a lot by itself.

Speaker 5 ([30:56](https://)):

No, no. About your specific interest in Instagram, TikTok threads. I've

Speaker 3 ([31:02](https://)):

Never, I've never, um, sat down and did that.

Speaker 5 ([31:06](https://)):

Okay. So you don't have, uh, an idea of what the value of that, of your interest in those comp in those, you know, how you use those platforms, what that value might be?

Speaker 3 ([31:20](https://)):

Are you talking about the things, the money that I make from posting on those platforms?

Speaker 5 ([31:24](https://)):

No, I'm not asking, we'll get to that in a moment. But how you use those platforms, how those, how that value. Have you ever done a determination of what that value is by using those platforms? Not necessarily individually what you get paid, but as a whole, what that value is? You understand that question?

Speaker 3 ([31:47](https://)):

The value of me as a person being on that, being on that correct platform.

Speaker 5 ([31:53](https://)):

Correct.

Speaker 3 ([31:54](https://)):

Oh, probably zero. There's a lot of f

Speaker 5 ([31:58](https://)):

So why do you think on Three thinks it has a value of over $800,000?

EXHIBIT DAR016 - Page 26

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 (32:03):

I just gonna interject that he obviously wasn't the person who offered that, and he wouldn't have personal knowledge of how they came to that

Speaker 5 (32:10):

Determination. And that's fine, but I'm, I'm asking him for his idea of, um, you know, he, he said he was familiar with on three. So would you dispute that on three wouldn't know what that value would be?

Speaker 3 (32:26):

They wouldn't know. They can assume.

Speaker 5 (32:30):

Okay. But so your testimony here today is that your, your valuation of how you use Instagram and the like is a zero value

Speaker 3 (32:44):

To in, alright, so if I just deleted my pages, the world's gonna keep going.

Speaker 5 (32:49):

Correct?

Speaker 3 (32:50):

That's what I mean, like it's not really anything like that.

Speaker 5 (32:53):

But again, you're saying it has a zero value?

Speaker 3 (32:57):

A zero value. Can you hear me?

Speaker 5 (33:02):

Yeah, I, um, it's a simple yes or no question. You, you just said that it has a zero value and I'm trying to make sure that I understand that that's what you're saying today. Zero value.

Speaker 3 (33:13):

I don't have any value to these platforms because I'm just one person. They have so many users.

Speaker 5 (33:19):

Okay. So do you get paid for signing autographs?

Speaker 3 (33:25):

I don't think I've gotten paid for signing an autograph before.

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 ([33:28](#)):

Okay. Do you get paid for teaching at camps?

Speaker 3 ([33:31](#)):

No, I never did it at camp. Okay.

Speaker 5 ([33:34](#)):

And so there's some postings on social media of you going out and buying luxury goods. You, you, you, you agree that you've done these, uh, these postings? I agree.

Speaker 3 ([33:43](#)):

Going there? Yes.

Speaker 5 ([33:45](#)):

Okay. And so do you actually go in and you purchase these goods or are these advertising where you get paid to say the name of the company but you actually aren't going in there and buying?

Speaker 3 ([33:57](#)):

I'm not sure exactly what post you're referring to, but if you show me then I can tell you.

Speaker 5 ([34:03](#)):

Okay. There, for example, I saw one that at Lewis, uh, it was an entity called Lewis and that you were gonna go and spend $50,000 that day.

Speaker 7 ([34:11](#)):

I think it was Louis Vuitton, Louis Vuitton story. Yeah, yeah,

Speaker 3 ([34:15](#)):

I know what you're talking about. You're talking about YouTube video?

Speaker 5 ([34:17](#)):

Yeah. So did you actually go in and make those purchases?

Speaker 3 ([34:22](#)):

I don't spend that much money like that now, but I get nice things sometimes, but no.

Speaker 5 ([34:26](#)):

But in that particular post, you said you're gonna go in and spend $50,000. Did you in fact do that?

Speaker 3 ([34:32](#)):

No, I didn't spend 50,000 for sure. I don't even think I spent 2000 the whole time in my whole life with Louis Vuitton.

EXHIBIT DAR016 - Page 28

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 ([34:40](#)):

And so this is more hyping what you do and how to generate interest in you.

Speaker 3 ([34:47](#)):

It's just playing around.

Speaker 5 ([34:49](#)):

So it's hype?

Speaker 3 ([34:52](#)):

No, it's just jokes.

Speaker 7 ([34:55](#)):

Okay.

Speaker 5 ([34:56](#)):

Um, and then you have a specific list of all your jewelry.

Speaker 3 ([35:07](#)):

I don't even have any jewelry.

Speaker 1 ([35:08](#)):

And so just to be clear, there was some jewelry that was loaned to Mr. Sanders, pursuant to an NIL deal. This was the amendment that we filed today. To clarify that r is actually owned by, is it <inaudible> Diamonds? Am I saying that right? Uh, Saki Diamond this evening.

Speaker 5 ([35:32](#)):

So the jewelry that's listed previously, you are not owner of?

Speaker 3 ([35:39](#)):

No sir.

Speaker 5 ([35:41](#)):

Not the owner.

Speaker 3 ([35:43](#)):

Not the owner of the jury. Now that, hold on, let him ask his next question. No, I be trying to talk too much on here.

Speaker 5 ([35:53](#)):

So that was, that was loan to you?

Speaker 3 ([35:56](#)):

This transcript was exported on Jan 17, 2024 - view latest version here.

Yes.

Speaker 5 (35:58):

Um, now I, I noticed that in your original filing you had a Robin Hood account that you valued at 300,000 and now it's $200,000. Um, is this just that the 300,000 was an estimate or have you paid it? Have you used those funds since the filing?

Speaker 3 (36:23):

It was a rough estimate.

Speaker 5 (36:25):

So the 200,000 that was listed, is it the actual amount that you had in the Robin Hood account the day you filed bankruptcy?

Speaker 3 (36:33):

Yes. And the statement was provided to Mr. Wadsworth as

Speaker 5 (36:36):

Well. Thank you. Okay. Now, um, so for the purposes of my next part of the questions here is we're just gonna call the name image, image likeness. We're just gonna call 'em Niss. Okay? Yeah. You're familiar with that term?

Speaker 3 (36:58):

Yes, NIL.

Speaker 5 (36:59):

Okay. So, um, there are NCAA rules that, uh, you have to comply with, is that correct?

Speaker 3 (37:08):

Yes.

Speaker 5 (37:09):

And then there's also state of Colorado rules that you need to comply with, is that correct?

Speaker 3 (37:16):

Yes. For NIL

Speaker 5 (37:17):

And then there's also the University of Colorado rules that you have to comply with?

Speaker 3 (37:23):

Yes.

EXHIBIT DAR016 - Page 30

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (37:24):

And are you in compliance with each of those entities rules and regulations with regard to the NI ls?

Speaker 3 (37:32):

Yes.

Speaker 5 (37:33):

Okay. So my understanding under Colorado law is that when you enter into an NIL that you have to report to the school with what that NIL deal is, again, within 72 hours or by the next scheduled game, is that your understanding?

Speaker 3 (37:54):

I don't know the actual rules like that, but yeah, I'm not entirely sure on the exact rules. A manager that, yeah, I have a manager that handles that.

Speaker 5 (38:05):

So is it a manager or, or an agent?

Speaker 3 (38:08):

Both.

Speaker 5 (38:10):

Are they There's a lot on

Speaker 3 (38:11):

The same,

Speaker 5 (38:13):

I'm sorry.

Speaker 3 (38:14):

There's, there's a, a team of people that handle that and stuff.

Speaker 5 (38:17):

Okay. And so these, this team of people, they negotiate the NI LS for you?

Speaker 3 (38:26):

I'm not sure exactly what they do, but they make it happen.

Speaker 5 (38:29):

So you don't do the actual negotiating yourself?

Speaker 3 (38:33):

EXHIBIT DAR016 - Page 31

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

No, I don't, I don't be negotiating.

Speaker 5 (38:36):

Okay. And so then once they've negotiated an an NIL for you, they have to report that to the university, is that correct?

Speaker 3 (38:44):

Yes.

Speaker 5 (38:45):

And they have to give that contract each one of those contracts to the university, is that correct?

Speaker 3 (38:54):

I'm not sure exactly what they do, but if I'm assuming then yes, every contractor.

Speaker 5 (39:02):

Okay. And when you do these contracts, are you an independent contractor or an employee of the company that has retained you

Speaker 3 (39:12):

B two one LLC or

Speaker 5 (39:14):

In the NI Ls?

Speaker 3 (39:16):

I'm not sure what the question is.

Speaker 5 (39:19):

Are you, when when, when you, when, when you, when you're employed to do, for example, I I I think I've seen you on a Kentucky Fried Chicken commercial. I think that was you, maybe not, but let's say actually seen that, let's say for example it was you on the Kentucky Fried Chicken commercial. Okay? Someone had to negotiate that deal for you since you didn't do it. And so in order for you to appear on that, you had to enter into a contract. Again, if I'm not saying this right, correct me, but you had to enter into a contract and they would tell you how much money you would get paid for entering into that contract. Am I describing this correctly?

Speaker 3 (40:03):

Yes.

Speaker 5 (40:04):

And so once that contract is entered into, you have to give it to the University of Colorado to let them know what your NIL deals are or to be. Any university that you happen to at have attended Jackson State University of South Carolina,

EXHIBIT DAR016 - Page 32

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 (40:23):

Um, back then in those days, NIL wasn't around.

Speaker 5 (40:28):

So, so that's a relatively new thing here. 2022 ish.

Speaker 3 (40:34):

So this is, this is why I'm kind of, I don't really know the answer to this stuff because NIL is really like a gray cloud. It has a lot of rules that you don't really like. It's new, so they don't really know every little rule, but I'm assuming yes, that's what they do.

Speaker 5 (40:52):

And if I understand that they give all the, that they give all the contracts to the school. For example, in your instance it's the University of Colorado.

Speaker 1 (41:00):

And if I can just interject and remind again that Mr. Sanders's prior answer was that if he does have a team of people that handles all of this as

Speaker 5 (41:06):

Well, right. But I'm just asking him what his understanding is of how Nils work and whether or not he understands that they should be given to the university. That's my question. You understand that these contracts under Colorado law need to be given to the University of Colorado?

Speaker 1 (41:22):

And again, I I think that he's already answered that there is a team of people who are handling

Speaker 5 (41:26):

All of this, right? I'm asking him about, not about his Tim, I'm asking about his understanding.

Speaker 1 (41:31):

Okay. So just answer you specifically know in these situations.

Speaker 3 (41:36):

Alright. I could tell you right now, go ahead. I don't know

Speaker 5 (41:39):

Nothing that's behind. That's, that's fine. And, um, and so, but you, you, uh, you review these contracts with your team and you signed those contracts?

Speaker 3 (41:52):

I don't review any contract, but I signed it to 'em.

EXHIBIT DAR016 - Page 33

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 5 (41:55):

Hey <laugh>?

Speaker 3 (41:57):

I shouldn't say

Speaker 5 (41:57):

<laugh>. No, no, that's, you know, Hey, that's,

Speaker 3 (42:02):

I look over it. I look over it.

Speaker 5 (42:04):

Some of them. And then, um, do you have an agreement with, do I guess, do you use the logos for CU in, in your, um, uh, in your nis?

Speaker 3 (42:17):

I usually just do whatever they say and wear or whatever they tell me that we're wearing.

Speaker 5 (42:22):

Okay. And so you have an agreement with them with the University of Colorado as well to, to use their logos, images? You know,

Speaker 3 (42:33):

It's not whatever, it's not really up to,

Speaker 1 (42:37):

Uh, because the question is to see you like pay you, for example, where you're gonna see you up to CU Bucks sweatshirt?

Speaker 3 (42:45):

Uh, if I'm allowed to, like some deals you're allowed to wear that stuff. It's not really up to the school. Sometimes it's really up to the brand if they want that in there. 'cause they just tell you wear plain clothes.

Speaker 5 (43:00):

Okay. Now, um, do, do you have any NIS with Porsche or Porsche?

Speaker 3 (43:14):

No.

Speaker 5 (43:15):

What about Actively Black?

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 (43:18):

Yes.

Speaker 5 (43:20):

And, um, with actively black, uh, well let, lemme step back a little bit. Any of the NIL deals do you have with any other athlete? Do you partner together with other athletes?

Speaker 3 (43:36):

Sometimes,

Speaker 5 (43:37):

Yeah. And who are those

Speaker 3 (43:38):

Athletes if you include my brother in it.

Speaker 5 (43:42):

Uh, and who's your brother?

Speaker 3 (43:44):

Shado Sanders. I have two brothers. One of my, my older brother, the fiance Junior was on a commercial with me too, but he is not an athlete.

Speaker 5 (43:56):

Okay. Who is Travis Hunter?

Speaker 3 (44:00):

He's a player on my team.

Speaker 5 (44:03):

Do you partner with Travis Hunter on NIL deals?

Speaker 3 (44:08):

I've never partnered with Travis. Now, we probably did the same brand before, but me and Travis never partnered on anything Businesswise.

Speaker 5 (44:17):

So are there NIL deals that you have appeared together with other than your brother Shado that you've appeared in an NIL deal together? Not that they both, you know, used the, the same platforms?

(44:37):

I don't think so. I don't think me and Travis ever was on the same thing before. Okay. And actively Black is a sportswear company, is that correct? Yeah. Okay. And then, uh oh, no, no, no, no, no, no, no, no, no. They're not, they're not a sportswear company. What is actively black? It's just, um, they're just, it is a

EXHIBIT DAR016 - Page 35

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

clothing brand. It's not a sportswear company. They, they don't really make sportswear brands. But it's a clothing company? Yes. It it clothing company you wear, I'm sorry, go ahead. It's a clothing company. They don't make any sportswear. Okay. And they pay you to wear their clothes and show people, hey, this is the stuff that they do. Is that how that works? Yeah. So you don't have any design interests that you design clothes and they, um, will manufacture 'em for you and then they mark it through you? Any designed clothes that you may do? No, I've never done a deal with them like that. Okay. Um, and then you also do, uh, Nils with, with Dion Sanders, your father.

(45:51):

Yeah. And that's with, but forgive me if I don't say this right? Kos Yogurt Court. Koss. Yeah. We did a deal with Kos before. Okay. Do you have any other deals with your father? NIL deals? Not entirely sure. Okay. Now I have a list of what may be associated to you, um, NIL deals. And I want to go through that list and you tell me if you're still participating in them, what the status of them are and the wife. Okay. Yes, indeed. But can I stop you real fast, sir? Sure. Okay. I have to use the bathroom right quickly. Sure, absolutely. Is there any Absolutely. Let's pause.

Speaker 1 (46:38):

I do just wanna clarify just for the purposes of the record as well, that when we're talking about some of these deals where there's been like other parties involved, for example, um, Dionne Sanders, that the deal is still, or the NIL deal itself is still with the brand specifically and not Dionne Sanders.

Speaker 5 (46:54):

No, I understand that, but it's just we're trying, I'm trying to figure out the scope Sure. Of all these NIL deals, you know, and where to look for information.

Speaker 1 (47:04):

So be back in five-ish minutes.

Speaker 5 (47:06):

It won't take that long, but yeah. Let's, let's

Speaker 8 (47:08):

Break. We'll come back at 2 55.

Speaker 5 (47:11):

2 55. Yeah.

Speaker 8 (47:24):

Thank you for calling the bankruptcy. Thank you for calling the bankruptcy control.

EXHIBIT DAR016 - Page 36

4854-6783-2225, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 (00:00:00):

All right, we are on the record.

Speaker 2 (00:00:03):

And, uh, Mr. Sanders, I just wanna remind you that you're still under oath. Do you understand that? Yes. And was penalty of perjury

Speaker 3 (00:00:12):

That a yes?

Speaker 4 (00:00:12):

Yes.

Speaker 2 (00:00:14):

Thank you. Uh, before I get into this list of, of, of, um, of items, um, you had mentioned that you had a team of people who assist you. Um, yes. So, um, if before you leave Ms. Riley's office today, if you can get an, the names and telephone numbers of each of the members of your team and Ms. Riley, if you can get that to me and Mr. Wadworth, um, by tomorrow,

Speaker 3 (00:00:44):

Um, we can certainly provide that information. Um, however, to the extent that you know, any of these parties are, you know, attorneys or have their own representation as well, we are gonna ask that any communication continue to go through your attorney

Speaker 2 (00:00:57):

And, and that's fine. That's fine. Um, now, uh, getting back to your $50,000 average per month, how, how do you get paid? How, how does that come into your possession? How do you get that money? <affirmative>. So do, do, does the LC you know, like today I need, um, you know, I want to go to the store and do a shopping spree. Does, do you just go to the LLC and withdraw money? Does the LC um, uh, you know, send you a monthly check or how does that work?

Speaker 4 (00:01:39):

I'm not entirely sure how, how that

Speaker 3 (00:01:41):

Works. So just put it into your terms. Somebody pays you on a due, how does that money get into your bank account or how do you spend it?

Speaker 4 (00:01:51):

Um, well, most of the time if I get paid from anything, then it goes to big two one LLC

Speaker 2 (00:02:04):

And then from big 21 LLC. How does it get to you?

**EXHIBIT DAR016 - Page 37**

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:02:09):

Uh, because the account is on my phone.

Speaker 2 (00:02:14):

So account,

Speaker 4 (00:02:18):

Yeah. I could just transfer it or use Apple Pay or anything.

Speaker 2 (00:02:22):

Okay. So when, when you, when you, when you make a withdrawal from the LLC, um, do you first consult with your, your, your team saying, Hey, can I take this money out? Or do you just take the money out without consulting with anybody?

Speaker 4 (00:02:38):

Well, I kind of look at it, at it as like I just pay myself, but I also have an account.

Speaker 2 (00:02:45):

Do you do, do you consult with the accountant on like, I can take this money this month, or, or you just do whatever, you know, and I'm not being flippant here, you just do what you want to do?

Speaker 4 (00:02:57):

Yeah, I'm usually really good with money, so I don't just try to spend every penny.

Speaker 2 (00:03:03):

Well, that's a good quality <laugh>. Um, and so basically what you, what you do is, um, every month when you need money, you go to the LLC, you withdraw it and then you put it into your personal account.

Speaker 4 (00:03:19):

Okay. One more time. One more time. Can you say that rundown one more

Speaker 2 (00:03:23):

Time? Okay. So when you need money, you go to your LLC bank account, you know, like you hit a home run last month, you know, and I'm just making numbers up here. You, you, you got a hundred thousand dollars NIL deal. It was deposited into the LLC account and it's like, oh, I'm gonna go take care of myself today. You know, I want to, you know, I want to go get some, a nice dinner. For example, just making this up, you would go into the, I guess it's uh, the big 21 account. You withdraw money and then put it into your personal account. Is that how that works?

Speaker 4 (00:04:05):

You could spend straight from the account. You don't have to put money in different accounts, but I would know how much that I use 'cause I basically paying myself.

**EXHIBIT DAR016 - Page 38**

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (00:04:14):

Okay. So you would use both the LLC account for your own personal use as along with your personal bank accounts whenever you needed to, to to pay bills, pay your rent, you know, pay your car payment, you would, you would use both a personal account and the LLC account?

Speaker 4 (00:04:34):

No, I like, I, I'd already put the other money that's not paying myself inside. Then the money that I have is like I'm paying myself. Then I use that

Speaker 2 (00:04:48):

By taking it out of the LLC account and putting it into your personal account.

Speaker 4 (00:04:53):

Uh, most of the time I just put the, um, account into something like an investment account or something.

Speaker 3 (00:05:01):

But for example, if you wanted to pay for dinner, it was part of the money that you were paying yourself, you would move that into your personal account to then pay for dinner. Right?

Speaker 4 (00:05:10):

I mean, technically if you put it like that, but it's not like different bank accounts like

Speaker 1 (00:05:15):

That. Yeah. Can I, can I maybe jump in and try, just clarify this? I think maybe we're assuming something that may not be the case. Mr. Sanders, do you actually have any bank account in your name, in your personal name?

Speaker 4 (00:05:26):

Yes, I have one of them.

Speaker 1 (00:05:27):

And who's that with?

Speaker 4 (00:05:29):

That's with Wells Fargo.

Speaker 1 (00:05:31):

Okay. And then you also have a, do you have one big 21 account at Wells Fargo?

Speaker 4 (00:05:36):

Yes. Yes.

EXHIBIT DAR016 - Page 39

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 (00:05:37):

So there's any other bank accounts that you have any connection to?

Speaker 4 (00:05:41):

Uh, big two one L-L-C-E-G.

Speaker 3 (00:05:47):

Your personal

Speaker 1 (00:05:47):

Account? Your personal account? Yeah. Any other bank accounts?

Speaker 3 (00:05:52):

Just the Robin Hood

Speaker 1 (00:05:53):

Accounts Plus that's, hold on, that's my next question, but any other just regular deposit accounts? Just those two?

Speaker 4 (00:05:59):

Yes, tho those are the ones that I have.

Speaker 1 (00:06:04):

And then you have a Robinhood investment account. Do you have any other investment accounts?

Speaker 4 (00:06:09):

Robinhood investment account, that's

Speaker 1 (00:06:11):

It. Okay. Do you, is your big 21 bank account linked to like your Apple Pay account on your phone?

Speaker 4 (00:06:20):

Yes.

Speaker 1 (00:06:20):

Okay. Um, is it linked to any, I mean, is that, do you pretty much use Apple Pay for everything?

Speaker 4 (00:06:28):

Most of the time Apple Pay if you use a card, anything, it is the same thing. It still goes up on the statement.

Speaker 1 (00:06:35):

Do you have credit? Do you have credit cards?

EXHIBIT DAR016 - Page 40

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:06:38):

No, I don't have a credit card.

Speaker 1 (00:06:40):

Um, so what do you use your personal account for? Do you actually move money from the big 21 account to your personal account?

Speaker 4 (00:06:50):

You guys are saying it like, I use Robin Hood and I use my big two one account.

Speaker 1 (00:06:57):

Okay, but you, you, I have, go ahead.

Speaker 4 (00:07:00):

I have a Shiloh Sanders account and I have a big two one LLC account and I have a Robinhood

Speaker 1 (00:07:05):

Account. Right. What do you use the Shiloh Sanders personal account for?

Speaker 4 (00:07:10):

I don't really like, just if I need to use something sometimes I don't really spend that much money, like to just have money going into so many different accounts, you know what I'm saying? Like whatever money that is in my account, that's my money in my, in my, um, that I leave in my account that I spend from is mine.

Speaker 1 (00:07:39):

And when you say my account, right? Is it the Charlotte Sanders account or is that the big 21 account?

Speaker 4 (00:07:44):

Alright, look, this is what I'm saying. <laugh>, I get money invested. The money that I spend is the money that I pay myself already.

Speaker 3 (00:07:54):

And when you're spending that money, is it being linked to the big 21 account or is it being linked to the Shiloh Sanders personal account

Speaker 1 (00:08:05):

Or both?

Speaker 4 (00:08:08):

I'm not sure.

Speaker 1 (00:08:08):

EXHIBIT DAR016 - Page 41

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Okay. But you have, I mean, Carrie, I don't think you gave me any bank statements before today, like you're supposed to. Do you, do you have records of both the big 21 and the and the Shiloh Sanders personal account accounts? Uh,

Speaker 3 (00:08:20):
Yes. And we can provide, I thought that I had uploaded those to too, so my apologies. Um so I will, uh, get those emailed over for both of the Wells Fargo accounts.

Speaker 1 (00:08:32):
Okay. And then before I, I just want, go ahead.

Speaker 3 (00:08:35):
Sorry. Do you just want the month where the case was filed or do you want a couple months

Speaker 1 (00:08:39):
Back? Well, I mean immediately I'd like the ones that were, I should have gotten before today, which would be the month of, um, October. But we're at some point we're gonna ask for farther back, I'm sure.

Speaker 2 (00:08:51):
From both entity. From both, from both Sanders, from and, and, and I and I'm sorry. I'm sorry, Mr. Watford, the, um, SS 21 does not have bank accounts, is that correct? Mr. Sanders?

Speaker 4 (00:09:06):
The which one?

Speaker 2 (00:09:08):
The SS 21 L lc,

Speaker 4 (00:09:12):
The only

Speaker 2 (00:09:12):
One have the bank accounts is the big 21 LLC, is that correct?

Speaker 4 (00:09:18):
I'm not sure what that LLC has

Speaker 3 (00:09:20):
The SS 21

Speaker 2 (00:09:24):
As far as you know, it has no bank accounts.

EXHIBIT DAR016 - Page 42

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:09:29):

I'm not sure what that LLC has.

Speaker 2 (00:09:33):

Okay, thank Go ahead Mr. Wa.

Speaker 1 (00:09:34):

Yeah, and I just, before I turn it back over to Mr. Rodriguez, I, I want a little more detail on, on the team. 'cause I get the sense that that's where most of the information is, uh, is held. So I guess first, who is Tabitha Plumber?

Speaker 3 (00:09:51):

Like what does she do for

Speaker 4 (00:09:52):

You? Oh, Ms. Tabitha is a lawyer.

Speaker 1 (00:09:55):

And where, where's she based?

Speaker 4 (00:09:58):

In California.

Speaker 1 (00:10:00):

And is she at a firm?

Speaker 4 (00:10:04):

I'm not sure.

Speaker 1 (00:10:05):

What does she do for you?

Speaker 4 (00:10:08):

She helps me with contracts.

Speaker 1 (00:10:14):

Is she your manager?

Speaker 4 (00:10:19):

No,

Speaker 3 (00:10:19):

Because she's the NIL attorney, right?

EXHIBIT DAR016 - Page 43

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:10:21):

Yeah,

Speaker 1 (00:10:22):

She's the NIL attorney. Is she your agent?

Speaker 4 (00:10:24):

I don't know everyone's labels. I'm sorry. I just,

Speaker 1 (00:10:26):

Okay, that's fair. That's fair. But is what Ms. Riley said correct? That she's the, she interfaces with the um, the NIL stuff?

Speaker 4 (00:10:36):

Yes, NIL.

Speaker 1 (00:10:36):

Alright. Do you have a manager?

Speaker 4 (00:10:40):

Yes. Who's that? There's different managers though.

Speaker 1 (00:10:42):

Okay. Gimme the, let us name 'em all.

Speaker 4 (00:10:45):

It's under, it is under S smack.

Speaker 1 (00:10:47):

Spell that

Speaker 4 (00:10:49):

Smack. M or S? SMAC.

Speaker 1 (00:10:53):

SMAC. What does that stand for?

Speaker 4 (00:10:57):

SMAC, I'm not sure, but it's Smack Entertainment.

Speaker 1 (00:11:01):

And that company is where your agent, or I'm sorry, where your manager or managers are, are employed?

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:11:10):

I'm, I'm under smack.

Speaker 1 (00:11:13):

Right. That company provides you management services?

Speaker 4 (00:11:16):

Yes.

Speaker 1 (00:11:18):

And you don't know the names of any of the people that provide those services?

Speaker 4 (00:11:22):

It's different ones. It's different people. It's not just one person.

Speaker 1 (00:11:26):

Right. Well, gimme some names. I, you must know some of the names.

Speaker 4 (00:11:30):

I don't want to get them involved in anything right now. I'm not sure if I can speak on on them, but

Speaker 3 (00:11:36):

Yeah. Um, so we can provide that information later and probably set up and help coordinate some meetings as well if you'd like.

Speaker 2 (00:11:44):

So, so Mr. Walrus, while you are asking that question, I just Googled smack and if I can just ask a question about that. Yeah. So is this a company that is, um, owned by your father

Speaker 4 (00:11:57):

Mac?

Speaker 2 (00:11:58):

Yeah.

Speaker 4 (00:12:00):

No,

Speaker 2 (00:12:02):

It, you does your, so as far as you know, your father does not have an ownership interest in SM

Speaker 5 (00:12:08):

I

EXHIBIT DAR016 - Page 45

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (00:12:10):

As far as you, I'm not,

Speaker 4 (00:12:11):

I don't know what interest he has, but,

Speaker 2 (00:12:15):

But you, maybe your father does have, uh, some business interests in smack as well, along with your, your business interests.

Speaker 3 (00:12:24):

Oh, again, I, he's already answered that he doesn't know what his father has. I, I think that answers that question.

Speaker 2 (00:12:30):

Okay. Go ahead Mr. Mr. Waard.

Speaker 1 (00:12:35):

Well, I mean, is there, is there like a pri

Speaker 3 (00:12:39):

Sorry, you just had to go spit some gum out. He'll be okay.

Speaker 1 (00:12:42):

Well, while we're waiting for that, I mean, Carrie, is there like a privilege? Is there any like, legitimate reason for not giving us these names?

Speaker 3 (00:12:48):

Um, so I, I think that legitimately part of this team, right? He's not entirely sure who's necessarily employed by whom. Um, I know Georgie Moskowitz, uh, I think is one of the people who works with sm. Um, there's a Derrick Sanderson, he also works, works with smack. Um, and there may be some others as well. Like I said, we're, you know, we're happy to provide that information.

Speaker 1 (00:13:14):

Um, okay. And you, you said Georgie Moscowitz and Derek Sanderson?

Speaker 5 (00:13:19):

Yes.

Speaker 2 (00:13:23):

Uh, is Michael Strahan?

Speaker 1 (00:13:27):

EXHIBIT DAR016 - Page 46

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

He's not, hold on. He's not, he's not on, on camera here.

Speaker 2 (00:13:30):

He's he's a founder.

Speaker 1 (00:13:31):

No, no, no. I'm saying Mr. Mr. Sanders wasn't on.

Speaker 2 (00:13:34):

Oh, I'm

Speaker 1 (00:13:35):

Sorry. Wasn't at the, at the mic so to speak.

Speaker 2 (00:13:38):

So, so you the founder is Michael Strahan and Constance Schwartz Marini. I don't see, and you

Speaker 4 (00:13:45):

Know, the founder of Smack is?

Speaker 2 (00:13:48):

That's what the website says.

Speaker 4 (00:13:51):

I don't know. Alright, so my position, I play sports, I play football and I go to college. All this extra stuff is not my expertise. I'm sorry, I'm trying to give good information, but some of these stuff I don't know. So

Speaker 3 (00:14:06):

To sort of maybe rephrase and help out here, do you know who has an ownership interest in PAC Entertainment?

Speaker 4 (00:14:12):

I don't know who even runs. M

Speaker 1 (00:14:17):

Lemme lemme jump back in here. So you've testified that m provides management services. Do you also have an agent?

Speaker 3 (00:14:25):

All that through snack?

Speaker 4 (00:14:27):

EXHIBIT DAR016 - Page 47

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Alright, so it is, I don't have like, okay, this is Agent, it's different people that, that help with deals and stuff that go over the contracts that tell me what I need to do every day.

Speaker 1 (00:14:41):

And is that, are all those people through Smack?

Speaker 4 (00:14:46):

Yes.

Speaker 1 (00:14:46):

Okay. You have no other company that provides you management or agent type services?

Speaker 4 (00:14:52):

I'm not sure. 'cause Smack works with different

Speaker 1 (00:14:54):

People. Okay, but you don't directly it would be through Smack.

Speaker 4 (00:14:58):

I do like sometimes I'll do a deal by myself, but not like it's under NIL 'cause it's legal, but I'm not sure. But really it's

Speaker 3 (00:15:08):

Just smack It's doing all of your,

Speaker 4 (00:15:10):

All of your stuff, right?

Speaker 1 (00:15:11):

Yeah. Give me an example of a deal you do by yourself.

Speaker 4 (00:15:15):

Like I might just mention someone and be like, can we do a deal with them or can we do this or say hit these people up or see if they can hook us up with a pass or something. I'll post stuff like that.

Speaker 1 (00:15:32):

And, and the communic the conversation you were just, I think describing, are you talking to somebody at Smack about that or are you talking to a third party? Yeah,

Speaker 4 (00:15:38):

Somebody. Somebody at Smack.

Speaker 1 (00:15:40):

EXHIBIT DAR016 - Page 48

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Alright. Alright. So we've got Smack, we have Ms. Plummer, uh, I think you said at one point you have an accountant. Is that somebody at Red Point here in Denver?

Speaker 4 (00:15:49):

Yeah.

Speaker 1 (00:15:49):

Do you have any other accountants other than Red Point?

Speaker 4 (00:15:53):

Uh, that should be the only accountant.

Speaker 1 (00:15:55):

Okay. And then you have Mr. Mr, you have Ms. Riley as a bankruptcy attorney, you have Mr. Van Horn, who I think is a bankruptcy attorney, correct? Yes. Mr. Sanders? Yes. And you're paying both of these attorneys? Yes. And then Mr. Vital is all like, he's not a bankruptcy attorney, but he's another attorney you have employed, right?

Speaker 4 (00:16:17):

Yes.

Speaker 1 (00:16:17):

Any other attorneys you have employed right now?

Speaker 4 (00:16:23):

I don't think so, but I'm not sure.

Speaker 1 (00:16:25):

No. Alright. Other than what we've, who we've talked about in the last couple minutes, anybody else you can think of that is, uh, providing you professional services in connection with, with the income you're generating? Any other lawyers, any other accountants, any other management agents, anything like that?

Speaker 4 (00:16:44):

No. Okay.

Speaker 1 (00:16:46):

Alright. Mr. Rodriguez, you can jump back in.

Speaker 2 (00:16:48):

Um, getting, getting to the professionals that you've retained prior to the filing of the bankruptcy, did you pay any retainers to these attorneys that, that they are holding and have not yet used those funds?

Speaker 4 (00:17:03):

EXHIBIT DAR016 - Page 49

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

I'm not sure.

Speaker 3 (00:17:11):

Uh, I can answer from my, from the answer is no.

Speaker 2 (00:17:17):

Um, sorry, I'm just going through my notes.

Speaker 1 (00:17:35):

Well, while you're doing that then let me jump back in 'cause I, I think I might've overlooked something. So who handle, is there some professional that's handling the big 21 account or business or is that somebody we've already talked about?

Speaker 4 (00:17:51):

Is there a professional that handles it?

Speaker 1 (00:17:53):

They're sort of managing the company, but I get the sense that you're not really managing that company. Is that an accurate

Speaker 4 (00:18:03):

Managing the company? Like as in what

Speaker 1 (00:18:05):

I, is somebody overseeing the contracts, somebody overseeing the money that's coming in. Is there anybody sort of keeping tabs on what's happening with all that money other than you? It's different.

Speaker 4 (00:18:13):

It's different. It is different. Like what I do is just I do the deals, I do what they tell me to do.

Speaker 1 (00:18:21):

Right.

Speaker 4 (00:18:22):

And you get paid from

Speaker 3 (00:18:23):

It. So the same team

Speaker 1 (00:18:25):

That is the exact same people.

Speaker 3 (00:18:26):

EXHIBIT DAR016 - Page 50

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Exactly. It, it's not like there's a separate, you know, separate attorney or separate account for the company. What Mr. Sanders has identified as his team, that is the team for himself. That is the team for Big 21.

Speaker 1 (00:18:40):

And is there of that team, can you name somebody if anybody who is sort of overseeing the bank account?

Speaker 4 (00:18:50):

Um, overseeing, I feel like everything I, I'm doing is overseeing so that, you know, is included and, and I'm like my, the people that on my team that helps me with that stuff, my stuff is open to them. So

Speaker 1 (00:19:09):

Does anyone have check writing authority on the big 21 account other than you do you know?

Speaker 4 (00:19:16):

No, I don't think so.

Speaker 1 (00:19:18):

Okay. Mr. Rodriguez.

Speaker 2 (00:19:20):

Okay. Um, and those, a lot of those were in my follow up notes here. So, um, so prior to SS 21, you had a company named SS one Legendary LLC. Is that correct?

Speaker 4 (00:19:37):

I don't know. I'm not sure about these names,

Speaker 2 (00:19:44):

So. Okay, that's fine. Do you, uh, what is Headache Gang?

Speaker 4 (00:19:53):

That is something I say in football.

Speaker 2 (00:19:59):

Okay. And you've trademarked that?

Speaker 4 (00:20:02):

I'm not sure the process of that, but

Speaker 5 (00:20:04):

I,

**EXHIBIT DAR016 - Page 51**

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:20:06):

I don't know. I don't know if it's a trademark. I don't know what exactly it is.

Speaker 2 (00:20:12):

Does Headache Gang have a website?

Speaker 4 (00:20:16):

No. Headache Gang doesn't have a website.

Speaker 2 (00:20:20):

So Headache Gang does not sell merchandise.

Speaker 4 (00:20:26):

Headache Gang selling merchandise?

Speaker 2 (00:20:29):

Yep. Hoodies, t-shirts, Colorado stuff.

Speaker 3 (00:20:35):

Mr. Rodriguez? I, I think maybe the source of confusion here is, are we referring to Headache Gang as like a separate legal entity or are you asking if he sells merchandise?

Speaker 2 (00:20:44):

Well, um, I have information that there is website for Headache Gang and they sell merchandise

Speaker 4 (00:20:56):

A website for Headache Gang. So are what are you asking me? Me personally?

Speaker 2 (00:21:02):

Because these are things that are associated to you?

Speaker 4 (00:21:05):

No, I'm saying what are you, like he's asking

Speaker 2 (00:21:07):

You what you're asking him. The question to you is, I asked you if you had a trademark for Headache Gang and you said you didn't know, but that you use that, that that's a term that you use in football. Yeah. Next question was, does Headache Gang have a website?

Speaker 4 (00:21:25):

Are you asking me if I have a Headache Gang website? That's what I'm saying. You have to ask

Speaker 2 (00:21:29):

EXHIBIT DAR016 - Page 52

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Me. Yes. I'm asking you about Headache Gang.

Speaker 4 (00:21:34):

Okay. What exactly are you asking? So

Speaker 2 (00:21:37):

Does as far as you, Ms. Riley, if I can just ask as far as you know, does Headache Gang have a website?

Speaker 4 (00:21:49):

I have a website. It's not Headache Gang have a web headache. Gang's not a person. It's just something I say. That's why I'm confused on your

Speaker 2 (00:21:56):

Question. Okay. So what you're saying today is that Headache Gang is far as you know, does not have a website. Is that correct?

Speaker 3 (00:22:05):

So he's asking about Headache Gang as a separate thing. Does Headache Gang as the separate thing have

Speaker 4 (00:22:11):

Its own list? No. No. Okay.

Speaker 2 (00:22:14):

And, and your testimony here today is that Headache Gang, as far as you know, sells no merchandise

Speaker 4 (00:22:23):

Headache Gang isn't it's Headache Gang is a word? It is two words.

Speaker 2 (00:22:27):

Okay. Um, and then, uh, you have a, um, NIL with Dr. Pepper. Is that correct?

Speaker 4 (00:22:36):

Yeah.

Speaker 2 (00:22:37):

And that, is that just through Instagram that you, you you promote Dr. Pepper through Instagram or do you do that through radio, television, or personal appearances?

Speaker 4 (00:22:51):

Um, I just did exactly what they asked me to, to post on social media.

Speaker 2 (00:22:56):

EXHIBIT DAR016 - Page 53

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Okay. And do you recall when you entered into that contract with Dr. Pepper?

Speaker 4 (00:23:03):

Um, the contract stuff, you have to ask Ms. Tabitha, but I remember when they told me to do it

Speaker 2 (00:23:11):

When I Did you start performing services for Dr. Pepper?

Speaker 4 (00:23:16):

I'm not exactly sure, but I'm sure if you know some of his information, you have some dates. So I'm, I'm not trying to, so

Speaker 2 (00:23:23):

Did you perform services for Dr. Pepper before you filed the bankruptcy?

Speaker 4 (00:23:30):

I'm not exactly sure.

Speaker 3 (00:23:32):

Um, we would be able to review the records and verify specifically what dates are

Speaker 2 (00:23:39):

And then, uh, you have a partnership with the University of Colorado through Instagram? That correct?

Speaker 4 (00:23:47):

I don't even know about that.

Speaker 2 (00:23:50):

Okay. Um, have you done, um, paid, um, I guess jobs for the University of Colorado? Were they paid appearances? Let's use that

Speaker 4 (00:24:07):

As in play football.

Speaker 2 (00:24:09):

Besides that do, do, do you do pro promotional services for the University of Colorado because of your status as a student athlete?

Speaker 4 (00:24:19):

Like press conferences?

Speaker 2 (00:24:21):

EXHIBIT DAR016 - Page 54

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

No, where you perform, where you go someplace and say, Hey, you know, I'm Shiloh Sanders, I play football, come to uni, you know, I'm just making this up. Come to the University of Colorado <inaudible>.

Speaker 4 (00:24:34):

Oh my bad.

Speaker 2 (00:24:35):

Do you, do you do those types of appearances for the and and that the university pays you for them?

Speaker 4 (00:24:41):

No, I don't advertise, um, Colorado Home.

Speaker 2 (00:24:45):

Okay. Uh, I asked you about Dr. Pepper and then do you have a pa uh, partnership with Google?

Speaker 4 (00:24:55):

Yes.

Speaker 2 (00:24:56):

Okay. And, and these appearances or whatever you do for Google, you did that before you filed your bankruptcy?

Speaker 4 (00:25:06):

I'm not sure on the exact dates you have to ask Ms. Tabitha who does all the stuff or ask someone on my team.

Speaker 2 (00:25:14):

Well, you, you can't remember when you filed bankruptcy and what you were doing before the bankruptcy. You know, you filed bankruptcy on October 23rd, 2023. So I'm, you can't remember if you were doing prefer work for Dr. Pepper, Google University of Colorado before those dates?

Speaker 4 (00:25:34):

I'm doing some college, but I'm just doing school, going to practice during the season. I'm focused on the season

Speaker 2 (00:25:41):

And we're certainly happy to provide you with some more specifics on those dates as well. What is Tent My Ride are, well, let, let, let me ask that a different way. Are you familiar with Tent? My right?

Speaker 4 (00:25:59):

Yeah.

Speaker 2 (00:26:00):

EXHIBIT DAR016 - Page 55

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

And how, how are you familiar with Tint? My right,

Speaker 4 (00:26:03):

Because they wrapped my car.

Speaker 2 (00:26:06):

They what?

Speaker 4 (00:26:07):

Wrapped? They put, um, vinyl wrap on my car

Speaker 2 (00:26:13):

And on the,

Speaker 4 (00:26:14):

On the Mercedes.

Speaker 2 (00:26:16):

So it it is like a promotional thing that you do for tent, am I right where you advertise for them by them putting stuff on your car?

Speaker 4 (00:26:28):

What I posted, I posted their work that they did.

Speaker 2 (00:26:32):

Okay. And that was before you filed the bankruptcy, is that correct?

Speaker 4 (00:26:36):

I assume so.

Speaker 2 (00:26:38):

Okay. And, um, you have a partnership with KFC?

Speaker 4 (00:26:46):

Yes.

Speaker 2 (00:26:47):

And as far as you can recall, did you perform this work for KFC prior to the date you filed bankruptcy? What, which was October 23rd, 2023.

Speaker 4 (00:27:02):

What exact date did I file you?

EXHIBIT DAR016 - Page 56

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 (00:27:04):

October 23rd.

Speaker 4 (00:27:05):

That was the same thing?

Speaker 3 (00:27:06):

Yeah. So the question is, did you do KFC before October 23rd or after October 23rd?

Speaker 4 (00:27:12):

Wait, did you say I did KFC on October 23rd?

Speaker 2 (00:27:15):

No, if you did it before,

Speaker 4 (00:27:18):

Oh, um, if I could, you know, look at my social media real quick and I could tell you all these answers, but I'm not sure. So I'm under oath right now. If I say the wrong thing, I'm not just trying to go jail.

Speaker 3 (00:27:33):

So, so is it all right if we pull up Mr. Sanders? Sure.

Speaker 1 (00:27:36):

Account. Well, hang on, hang on, hang on. It we're, we're 80 minutes into this and I think that the creditor wants to ask some questions so we can, we can deal with that at a later time. How much more do you have, Mr. Rodriguez?

Speaker 2 (00:27:45):

I got 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 entities to talk about.

Speaker 3 (00:27:55):

So, and Mr. Rodriguez and Mr. Wadsworth, would it potentially be helpful if you send us a list and then of all these deals and then we can provide you with the exact dates when all of these deals were entered into, when the services were performed and when payment was made on them? Because I, I, again, you know, you're right, we are 80 minutes into this, um, and it may be a little bit more efficient if we do it that way and that way we can have, we can ensure that we're providing full and accurate information on all of this as

Speaker 1 (00:28:22):

Well. Yeah, I'm not against that. Um, I'm

Speaker 2 (00:28:25):

Not either.

**EXHIBIT DAR016 - Page 57**

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 (00:28:26):

Yeah. And I also, I mean, I guess Mr. Rodriguez, why don't you hang on. I mean, is are you at a good point to pause for a second,

Speaker 2 (00:28:31):

Assuming? Yeah, and actually I can turn it over back to you, you know, 'cause if you, you know, I have this list and it's got specific dates of when these contracts may have been entered into and specific websites or, um, references to some public record. Um, which I believe you, you, you, you also have, right? So I, I'm happy to turn it back to you. Those were all my questions. Okay.

Speaker 3 (00:28:57):

I I do have sort of an unusual request here, but I am a little bit concerned because of course we are on the record. This is, you know, under oath that, um, the information on the Headache Gang stuff may have gotten a little bit lost in translation. So would it be all right if I just ask a couple of clarifying questions there to make sure that Mr. Sanders's testimony is clear since again we are recording.

Speaker 1 (00:29:17):

Let me, let me try to do that. Um, um, and then, but before I do this, well let, that'll be the next thing we do. Mr. Miller, since you're the only one I think with your, in your group with the camera on, are you gonna ask questions?

Speaker 2 (00:29:30):

Yes, that's

Speaker 1 (00:29:30):

Right. Is anybody else from, I think you're with Mr. Raphael and Mr. Sleep Baum. Anybody else gonna ask questions?

Speaker 2 (00:29:35):

Uh, Mr. Raphael may have some follow up questions with me, but I, I probably will do the bulk of

Speaker 1 (00:29:40):

Our questions. Okay. And then who is Alexis Weber?

Speaker 4 (00:29:43):

Uh, she's my associate.

Speaker 1 (00:29:44):

Okay. Alright. Okay, so yeah, so let's, let me ask a couple questions about this Headache Gang and then, then we'll turn it over to Mr. Miller. Um, so Mr. Sanders, there is merchandise being sold with that phrase on it, right?

Speaker 4 (00:30:02):

No,

EXHIBIT DAR016 - Page 58

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 (00:30:03):

There's not,

Speaker 4 (00:30:05):

No sir. No headache game closed.

Speaker 1 (00:30:08):

All right, hold on. I gotta find there's, I got some post here. Here it is. So there's a Shop headache.online store. Are you familiar with that?

Speaker 4 (00:30:24):

Okay. No, <laugh>. Wait, hold on. Yes, yes. But let, let me, can I clarify this

Speaker 1 (00:30:29):

Sure. Real quick? Sure,

Speaker 4 (00:30:30):

Sure. Because I'm wonder, you know, I'm not really on these type of calls a lot, so I don't wanna say the wrong thing. All Headache Gang is for football. Nothing on that website says Headache Gang.

Speaker 1 (00:30:46):

Okay. What's on that website?

Speaker 4 (00:30:48):

Save yourself the headache and the word headache. That's clothing.

Speaker 1 (00:30:55):

Okay. And are you, how are you connected to that?

Speaker 4 (00:30:59):

I created the word Headache Gang. I mean, I didn't create the words, but that's my term. So I was just like, hmm, what can go cool with this to use for clothing? So Headache Gang doesn't have any website or anything. 'cause Headache Gang isn't that, that the brand headache, the brand Save Yourself the headache that goes with a headache. That's for clothes. And I told Ms. Tapa that before and I think Georgie and everyone was confused, but that's headache gang's only football.

Speaker 1 (00:31:36):

Okay. And I, it's still not, it's still not clear. So I'm looking at a, at a, at a, at a uh, headache hoodie that's black that I can buy for $80. Are you connected to that?

Speaker 4 (00:31:50):

So like if somebody buys this hoodie, does that money go get you? Uh, it goes to the guy that runs the account and then he'll pay me from there.

EXHIBIT DAR016 - Page 59

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 1 (00:31:58):

And then also it goes to

Speaker 4 (00:31:59):

Who actually sells it. Say

Speaker 1 (00:32:01):

It again.

Speaker 4 (00:32:02):

It goes to the guy that, that runs this, um, website.

Speaker 1 (00:32:07):

And who is he?

Speaker 4 (00:32:10):

He is <inaudible>, I don't know, it's a, he owns this business that Princes and ships and, and does all of that. So like Prince and Ships clothing? Yeah, I don't know his actual name.

Speaker 1 (00:32:26):

And do you have a formal contract with him?

Speaker 4 (00:32:30):

Um, I don't think it's a contract, but Headache and Headache Gang is two different things.

Speaker 1 (00:32:39):

Okay. You, you have an Instagram post that lists you as hashtag Headache Gang Trademark CEO. I guess from your testimony, that's somewhat a of a meaningless description. I mean, there's no trademark, there's no company to be a CEO of.

Speaker 3 (00:32:53):

So, so just to clarify, I think that there is a trademark for Headache Gang. There's also this separate website. Um, the website specifically sells clothing that it has the word headache, but Headache Gang is a term that Mr. Sando Sanders specifically identifies with football and it's not necessarily on the merchandise that's being sold on the website. Does that help?

Speaker 4 (00:33:20):

Headache Game is football. I'm, I I, I'm gonna, um, describe it. So whenever I hit someone in football, I play safety. So we have to tackle, if you make a hard tackle, the person might get a headache. So it's Headache Gang. Now I don't use Headache Gang for clothes 'cause that'd be kind of weird to put. I don't wanna put gang on a shirt, so I'd rather just put headache, save yourself the headache. 'cause I don't wanna walk around with a gang on my shirt. So,

Speaker 1 (00:33:52):

This transcript was exported on Jan 17, 2024 - view latest version here.

So you're not, you're not mon you're not making money off of the use of the phrase headache gang. You're making money off the use of the word headache and the phrase save yourself from a headache or whatever you just said.

Speaker 4 (00:34:03):

Yeah, I mean, if I ever sold any headache gang stuff, then I probably could, but.

Speaker 1 (00:34:08):

Alright. Um, Mr. Miller, why don't you, uh, if you have questions, think now's a good time just to jump in. Um, and

Speaker 3 (00:34:16):

You're on mute just for the per record as well. Uh, at this point, Mr. Vital and Mr. Van Horn may jump in, uh, uh, with some injections and objections to the extent that this becomes a little more deposition as well. Okay?

Speaker 2 (00:34:29):

Okay. Alright. Well thank you Mr. Sanders for being here today. My name is Andrew Miller. I represent, um, Dar, excuse me, John Daron, um, in relationship as a creditor to your bankruptcy. Um, I'm just gonna ask you some follow up questions from some of the stuff that was asked here today. I, I, I'll start just where we kind left off with the head of gang stuff, I think I understand, and Clar, please clarify if I'm mistaken. So the term Headache gang, that's just a term that you use with some of your, um, compatriots on the football team to describe what you guys do, right? You're, you're part of this Headache Gang, which is a group of people maybe, or you individually when you do something good on the football field, you refer to yourself as a headache gang, is that right?

Speaker 4 (00:35:12):

Yes. And I'm the headache gang, CEO.

Speaker 2 (00:35:14):

And you're the CEO because in your opinion, you're, you're putting out the most headaches, so something like that. Yeah. Right. Okay. And then what you've done is you've taken that Headache gang thing, you said, well, this is something fun, this is something cool. Maybe we can create a little business off of this since it's getting a little, uh, media attention. So you created the Headache brand. Is that, is that more or less correct?

Speaker 4 (00:35:34):

Yes. Headache. Headache. Right,

Speaker 2 (00:35:37):

Right. And then that out of that came this idea to sell this merchandise online through the website that we've kind of been discussing, correct?

Speaker 4 (00:35:44):

EXHIBIT DAR016 - Page 61

This transcript was exported on Jan 17, 2024 - view latest version here.

Yes.

Speaker 2 (00:35:45):

Okay. And just looking at those products, it looks like you have a, a, a hoodie you can buy and also a t-shirt, right. And, um, you said that there's a gentleman who runs this website, correct?

Speaker 4 (00:35:57):

Yes.

Speaker 2 (00:35:58):

Okay. And then you receive part of the proceeds from any sale that comes from this website,

Speaker 4 (00:36:03):

Correct? Yeah. Okay. Me as in it gets sent to Big 21. Yes. It's not dollar standards.

Speaker 2 (00:36:13):

Oh, thank you. Yeah, that was gonna be my next question. So any money that comes from this website, he wouldn't pay you directly, he pays Big 21 LLC, right?

Speaker 4 (00:36:21):

Yeah.

Speaker 2 (00:36:22):

Okay. Do you know if you have a written contract with that gentleman in terms of what your percentage share is for, for the sales?

Speaker 4 (00:36:30):

Uh, we'd have to ask Ms. Tabitha about that or Georgie.

Speaker 2 (00:36:34):

Okay. Uh, so was that relationship, uh, put together by, um, Ms. Tabitha, or sorry, Ms. Plummer or one of your other people?

Speaker 4 (00:36:44):

Uh, Ms. Ms. Tabitha's involved in looking over everything, but Miss, uh, Georgie, she was that stuff together. Okay.

Speaker 3 (00:36:52):

And again, this Moskowitz who is with Smacker payment.

Speaker 2 (00:36:57):

Got it. Okay. So, um, did you initiate the relationship with this gentleman who runs the Headache Gang website or is that initiated through one of your, your team members?

EXHIBIT DAR016 - Page 62

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:37:09):

Um, that was initiated through Georgie.

Speaker 2 (00:37:13):

Okay. So is that something I'm gonna continue kind of on this thread, is that, is that you had the headache gang, whose idea was it initially to come up with the apparel?

Speaker 4 (00:37:26):

To come up with the apparel? Yeah, I'd say that was my idea.

Speaker 2 (00:37:30):

Okay. So you said we can put this stuff on some sweat, some hoodies and some t-shirts and, and maybe make some money off it. Right?

Speaker 4 (00:37:38):

I was like, man, everyone keeps asking me do I have me. So there you go. I make some of em.

Speaker 2 (00:37:43):

Great idea. If I had a, if I had a catchphrase, I'd put it on some t-shirts too, but I don't think anyone would buy it. Um, so did you approach the gentleman who runs this website first or did you approach one of your team members and say, Hey, how can we make this happen? Do you recall?

Speaker 4 (00:38:02):

I just told you that.

Speaker 2 (00:38:04):

Well,

Speaker 4 (00:38:05):

You said I just said Georgie.

Speaker 2 (00:38:07):

Okay. So you said you worked with Georgie, but I'm wondering, uh, did you approach Georgie and say, Hey Georgie, how can we make this happen? Or was it the other way around? Uh, how, how does this get initiated is what I'm asking?

Speaker 4 (00:38:20):

Georgie knows Georgie, you looking for people all the time.

Speaker 3 (00:38:24):

So the question is, did you go to Georgie and say, I wanna make shirts, or did Jordy come, Georgie come to you and say, Hey, here's a deal we might wanna look at?

EXHIBIT DAR016 - Page 63

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (00:38:32):

Yeah, thank you.

Speaker 4 (00:38:34):

I was like, dang, it's time to do merch. And then she, uh, finds people who do the merch. She found a lot of people though.

Speaker 2 (00:38:43):

Okay. So in this example was, was that a phone call you would've had to Georgie? So you called Georgie up, or maybe you texted Georgie and said, Georgie, let's do the merch. Let's figure out a way to do this.

Speaker 4 (00:38:55):

Um, probably by phone.

Speaker 2 (00:38:56):

Okay. And then she would've connected you with the gentleman who runs this website or she would've handled it all on her side?

Speaker 4 (00:39:04):

Sir, you're asking me about things that go behind the scenes? I don't know.

Speaker 2 (00:39:08):

Well, I'm, I'm asking you, what, what was your involvement from the time that you talked to Georgie and say, Hey, let's do this merch. What was then your involvement between then and this website actually being up and these sweatshirts being available online? What was your involvement in that interim?

Speaker 4 (00:39:25):

My involvement was to play good on the field and then that could really just advertise everything. So. Okay.

Speaker 2 (00:39:33):

Let me give you an example. So for instance, there is the, um, headache is not written in like a, a common font, right? It's it's written in a different sort of font. Is that something that you drew up or is that something that someone else came up with?

Speaker 4 (00:39:49):

Uh, I didn't draw that someone else drew that, but I just gave him the words.

Speaker 2 (00:39:53):

Okay. So you, so did you review that drawing before it was placed onto a sweatshirt? For instance,

Speaker 4 (00:39:59):

EXHIBIT DAR016 - Page 64

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

The drawing? Did I see the design before they put on the shirt? Yes.

Speaker 2 (00:40:02):

Yeah. Did you see the design before it was on the sweatshirt? Yeah.

Speaker 4 (00:40:05):

Yes sir. I did. And

Speaker 2 (00:40:06):

Did you okay it give your a thumbs up.

Speaker 4 (00:40:11):

I actually, you know what, I actually didn't, I didn't want that color on that website. I didn't want that color <inaudible>, but the design? Yeah, but that color, nah, I didn't ask for that color.

Speaker 2 (00:40:23):

Okay. But you, I was actually happy

Speaker 4 (00:40:25):

About that.

Speaker 2 (00:40:26):

Okay. Yeah, I'm just trying to understand what your involvement was from, from kind of start to finish. So, um, there was, I assume, well you, I'm, I gonna assume you can answer this. Do you know if there's a contract between Big 21 and, um, the, the owner of the website,

Speaker 4 (00:40:48):

The owner of the website in Big 21? I'm not sure if there's a contract.

Speaker 2 (00:40:52):

Okay. Do you know what percentage you make off of the sales of each of these clothing items?

Speaker 4 (00:40:58):

Not exactly sure, but we could get that to you.

Speaker 2 (00:41:02):

Okay. Um, but any payments that are received outta this go straight into the big 21 bank account, right?

Speaker 4 (00:41:09):

Yes. Okay.

Speaker 2 (00:41:10):

This transcript was exported on Jan 17, 2024 - view latest version here.

Is there anyone, um, I mean you talked to Georgie's, a member of your management team, right? Is there a contract between Big 21 and, uh, was it Smack Entertainment?

Speaker 4 (00:41:25):
Do, going by back to the last question. Sure. You said that the payment between any payment received that goes to Big 21 No, it goes to the guy that runs the thing,

Speaker 2 (00:41:39):
Right? And then, and then he sends you your portion, right?

Speaker 4 (00:41:43):
Yeah. He sends Big

Speaker 2 (00:41:44):
21. And and that goes to Big 21, correct?

Speaker 4 (00:41:48):
He sends Big 21 a portion, yeah.

Speaker 2 (00:41:49):
Right, right. And then that's funds that you have access to, correct?

Speaker 4 (00:41:54):
Um, I just have access to whatever the, whatever I get paid from, from the business.

Speaker 2 (00:42:01):
Okay. Uh, what about, so my next question was Smack Entertainment. Do they have a, a contract directly with you or do you know, do they have a contract directly with Big 21? Do you know how that arrangement is set up contract

Speaker 4 (00:42:14):
Here? Big 21?

Speaker 2 (00:42:16):
Yeah. Who's the contract between?

Speaker 4 (00:42:19):
Uh, I'm not sure if they work like that. I don't think it works like that. Okay.

Speaker 2 (00:42:26):
How, how do you think it works

Speaker 4 (00:42:29):

This transcript was exported on Jan 17, 2024 - view latest version here.

When they, when they represent people? They don't, I don't think it's a contract.

Speaker 2 (00:42:36):

Okay. Would, would they be upset with you if you went and got a different manager who started representing you and other NIL deals?

Speaker 4 (00:42:44):

They probably wouldn't care 'cause they'd have Dion Sanders.

Speaker 2 (00:42:48):

Okay. Okay. Do they get a, how are they paid by you for the work that they do for you?

Speaker 4 (00:42:55):

I'm not exactly sure. I'm sorry.

Speaker 2 (00:42:58):

Okay. Do they receive a cut?

Speaker 4 (00:43:00):

I'm, I'm sure they do.

Speaker 2 (00:43:02):

Okay. But do you know sitting here today what that cut is?

Speaker 4 (00:43:05):

No, I don't know.

Speaker 2 (00:43:06):

Okay. Mr. Miller, may I ask you a question on that? Yeah, please. So with regard to the, the, the question that Mr. Miller asked about the cut, do you know if they take what they are owed and then deposit the money into your account or it's your job to pay them when they tell you what is owed?

Speaker 4 (00:43:29):

It is random actually. And I know I sound crazy, but it is, it's not the same every time.

Speaker 2 (00:43:36):

Explain the randomness of that.

Speaker 4 (00:43:38):

Sometimes it does, sometimes it doesn't. So

Speaker 2 (00:43:42):

What do you mean by

EXHIBIT DAR016 - Page 67

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:43:42):

That? Like, sometimes I have to pay, um, Georgie and smack sometimes, then it's already factored in.

Speaker 2 (00:43:59):

Okay. And does that work the same way with Ms. Plummer or do you know how you pay Ms. Plummer?

Speaker 4 (00:44:08):

Um, I assume this actually, I actually don't know.

Speaker 2 (00:44:17):

And is she simply serve as your attorney to look over contracts or does she do any agent work for you? And by agent work, I mean, does she promote you in any way and secure deals for you in which she gets some kind of cut?

Speaker 4 (00:44:36):

I'm not sure.

Speaker 2 (00:44:37):

Not sure? Okay. Do you know if you have an agent in terms of NI for your NIL deals?

Speaker 3 (00:44:46):

So again, I'm just gonna interject that this was in information that Mr. Sanders had already testified to. You testified that there's not one particular agent Smack entertainment in general provides services and there's a number of different agents.

Speaker 2 (00:45:00):

Well, I think he described those as managers. So I think you're misremembering his testimony. I'm I'm talking about agents as are. Do you understand that there, do you understand there to be a difference between managers and agents, Mr. Sanders?

Speaker 4 (00:45:14):

No, I do not understand that.

Speaker 2 (00:45:16):

Okay. So do you know if smack entertainment is serves as your managers or serves as your agents or you don't know sitting here today?

Speaker 3 (00:45:25):

Are they one of the same

Speaker 2 (00:45:26):

Or are they one

EXHIBIT DAR016 - Page 68

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:45:28):

To my brain the same.

Speaker 5 (00:45:30):

Okay.

Speaker 2 (00:45:37):

Um, do you know who my client John Daron is?

Speaker 4 (00:45:42):

Yes.

Speaker 2 (00:45:43):

Okay. Um, are, are you aware that there's a judgment entered against you in his favor?

Speaker 4 (00:45:50):

Yes.

Speaker 2 (00:45:51):

Okay. Um, as far as this bankruptcy, are you, are you contesting in any part of that judgment?

Speaker 3 (00:45:59):

Um, is the question we contest the claim or can you clarify what you mean by that question?

Speaker 2 (00:46:11):

Uh, Mr. Sanders, are you, are you contacting the claim or any portion of that judgment that was entered against you in favor of Mr. Dar John Daron?

Speaker 4 (00:46:21):

Can you repeat that one more time, sir?

Speaker 2 (00:46:23):

Yeah, lemme try to rephrase it. Do you agree that there was approximately an $11 million judgment entered against you in favor of John Daron?

Speaker 4 (00:46:32):

Do I agree?

Speaker 2 (00:46:33):

Do you agree that that exists?

Speaker 3 (00:46:35):

EXHIBIT DAR016 - Page 69

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

So I think maybe part of the question here might be, are you asking if he agrees with the underlying facts or just the fact that a judgment was entered against him?

Speaker 2 (00:46:48):

Just a second and then we'll, we can talk about the facts briefly. I don't want to spend too much time on this 'cause I know the trustee's not as interested. But do you agree that there's a judgment against you in favor of John Daron?

Speaker 4 (00:47:03):

I don't know what to say about this.

Speaker 3 (00:47:06):

Do you acknowledge that there is a judgment that was entered? Maybe that's

Speaker 4 (00:47:10):

<inaudible> I know of a judgment.

Speaker 2 (00:47:14):

Okay.

Speaker 4 (00:47:15):

I don't want to use, I don't want agree. I don't agree to anything.

Speaker 2 (00:47:20):

What do you mean you don't agree to anything? Okay,

Speaker 5 (00:47:25):

<affirmative>,

Speaker 4 (00:47:28):

What do you mean?

Speaker 2 (00:47:29):

Well, you, you made a statement. I'm just trying to clarify what you meant by I don't agree to anything. What does that mean? Yeah,

Speaker 4 (00:47:35):

I don't, I don't agree to how everything's getting played. You know,

Speaker 2 (00:47:41):

I, I don't know. Can you explain that a little further? I

Speaker 4 (00:47:43):

EXHIBIT DAR016 - Page 70

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Can agree with the whole situation.

Speaker 3 (00:47:45):

So I, I think if maybe I could help to translate here. Um, we don't agree to the underlying facts of the judgment. Uh, we don't agree that judgment should have been entered. Um, and judgment was entered at a time when Mr. C Sanders was unrepresented in a Texas court and wasn't even aware that there was a trial date. So I think it is specifically the term agree that there is a judgment or agree with the judgment that Mr. Sanders is objecting to in this instance.

Speaker 2 (00:48:12):

Okay. You said you don't agree with the underlying facts of the judgment. Is that Ms. Carey said that? Is that, do you agree with that Mr. Sanders

Speaker 4 (00:48:20):

Say those are facts I wouldn't even say those are facts, so,

Speaker 2 (00:48:23):

Okay. What is your understanding of the underlying facts of the judgment?

Speaker 4 (00:48:28):

I wouldn't say facts. They're not facts. Okay. Your client know not facts.

Speaker 2 (00:48:35):

Say that again.

Speaker 4 (00:48:38):

I'm not really trying to do this right now, but if you have any questions, uh, I I think that what he's asking you is, what do you say happened? What do I say that happened? Well, I

Speaker 2 (00:48:50):

Haven't gotten, I haven't, I haven't gotten to that Mr. Va. Okay.

Speaker 4 (00:48:52):

Alright.

Speaker 2 (00:48:53):

Uh, uh, I'm, I'm asking him because he says he disagrees with, well, Ms. Carey said that he, they disagreed with the underlying facts of the judgment, correct?

Speaker 3 (00:49:03):

I, I should have, that was a mistake on my part. I should have recharacterized that as we don't agree with the underlying allegations that were the basis of the complaint or the allegations raised as part of the default judgment motion, uh, that Mr. Jaron filed on a pro se basis in the underlying action.

EXHIBIT DAR016 - Page 71

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (00:49:23):

Okay. Um, so I'll just ask this question. Mr. Sanders, do you agree that you assaulted Mr. Daron at any time?

Speaker 4 (00:49:33):

No.

Speaker 2 (00:49:34):

Okay. Uh, do you agree that there was a judgment entered against you for allegedly assaulting Mr. Daron?

Speaker 4 (00:49:47):

Is he saying the same thing?

Speaker 3 (00:49:49):

So again, to, to sort of reemphasize what Mr. Sanders has already testified here, the issue was with the term agree. He's acknowledged that there was a judgment that was entered against him, but disputes the allegations. And again, the judgment was entered at his time when Mr. Sanders was not represented and was not aware that there was even a trial date set.

Speaker 2 (00:50:13):

Okay. Well, Mr. Sanders, do you agree that judgment was entered that found that you had assaulted Mr. Daron?

Speaker 4 (00:50:21):

Alright. Can you use a different word than agree?

Speaker 2 (00:50:25):

Okay. Do you admit that there was no judgment was entered against you for assaulting Mr. Daron?

Speaker 4 (00:50:31):

No, that's not why, that's not why that

Speaker 2 (00:50:35):

Happened. Okay. So why did it happen?

Speaker 4 (00:50:37):

Not because of that.

Speaker 2 (00:50:39):

So why don't you, okay, so, so go ahead and tell me right now why that

Speaker 4 (00:50:43):

EXHIBIT DAR016 - Page 72

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Was the reason it happened and then there, then we wouldn't be on this call right now 'cause it's not true.

Speaker 2 (00:50:49):

Okay. So which part is not true?

Speaker 4 (00:50:52):

Saying I assaulted anyone.

Speaker 2 (00:50:55):

Okay. Uh, can you tell me briefly today what actually happened?

Speaker 4 (00:51:01):

Yeah. Daron assaulted a child in school.

Speaker 2 (00:51:06):

Okay. And who was that child?

Speaker 4 (00:51:08):

I think he taking me to court over this. So

Speaker 2 (00:51:10):

Why don't you go ahead and tell him from your recollection

Speaker 4 (00:51:13):

What happened? Okay. I'm in the school. I have my phone in my hand and this happened nine years ago, so I have the phone in my hand. Uh, your client came up and grabbed his skin off my arm and I moved away and he assaulted me by pushing me into the wall and banged me up against the wall, then took me to the ground and then when they got him up off of me, then he wants to be like, oh, they're probably gonna sue me, let me, uh, probably sue them. And he tried to play victim for, and I, I don't even know how someone could even do this for this long and it's still going on. So I'm, I'm the victim.

Speaker 2 (00:52:06):

Okay. Okay. Uh, I wasn't there so I, you know, I'm not making any statements about what happened. Uh, is it your position that you met, you did not assault or attempt to defend yourself against Mr. Daron in any way

Speaker 4 (00:52:21):

In that situation that we're talking about? Yeah, I try to get away from Daron. Okay. That's all I want to do is get away from him. Okay.

Speaker 2 (00:52:31):

Um,

EXHIBIT DAR016 - Page 73

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (00:52:32):

No intent of, in my mind, I'm not thinking of, oh, let me fight him, let me defend myself. Nothing, I didn't do anything but try to get away.

Speaker 2 (00:52:42):

Okay. Uh, do you agree that you participated in that litigation?

Speaker 4 (00:52:49):

I don't know what

Speaker 2 (00:52:49):

That means. Uh, for instance, you sat for your deposition in relationship to that lawsuit, correct?

Speaker 4 (00:52:55):

Yes, I did a deposition,

Speaker 2 (00:52:56):

Yes. Okay. Uh, uh, I understand that you served jail time or went to juvenile detention in relationship to that. Is that correct?

Speaker 4 (00:53:10):

I didn't serve nothing in relationship to to that.

Speaker 2 (00:53:13):

Okay. You didn't spend any, you didn't spend a month in juvenile detention at any time? Was that for an unrelated matter?

Speaker 4 (00:53:21):

So I was unrelated, but Mr. How, how this is, uh, germane to the administration of, uh, this bankruptcy. So, uh, I would, would, uh, that that I, I would like to interject that I, I don't see how that relates to the administration of this estate, but I would defer to the, uh, bankruptcy lawyers and Mr. Wadsworth?

Speaker 1 (00:53:40):

No. Yeah, I, Mr. FII tend to agree with you. I don't, I'm not sure. I think maybe Mr. Miller, you're going a little far outfield here.

Speaker 2 (00:53:45):

Okay. Alright, I'll move on. Okay. I wanna talk about NIL deals just generally and kind of how they work from your end. So we just kind of talked about the headache, uh, uh, uh, sweatshirts and the T-shirts that you wear that you have posted. I wanna talk just generally about NIL deals and we can use one maybe as an example. Um, so let's take, uh, I think Mr. Rodriguez talked about a Dr. Pepper NIL deal that you had recently. Do you recall that Dr. Pepper deal?

Speaker 4 (00:54:22):

EXHIBIT DAR016 - Page 74

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Uh, can you discuss these? NIIO deals with Ms. Tabitha, please.

Speaker 2 (00:54:26):

Well, I'm asking you today Mr. Sanders, and if, if you don't know, then you know, we can ask Ms um, plummer those questions if necessary. Okay.

Speaker 4 (00:54:35):

Mo most of this exact date stuff with these NIO deals, that's not, I'm not over that.

Speaker 2 (00:54:43):

Okay. I understand you don't recall exact dates and those kind of things. What I'm trying to do is have a general understanding of the NIL deals from your perspective. Does that make sense?

Speaker 4 (00:54:54):

Okay, I got you.

Speaker 2 (00:54:55):

Okay. So for instance, for Dr. Pepper, um, how did, how did, how was that born? Where did that come from? Does Dr. Pepper coach you?

Speaker 4 (00:55:05):

My

Speaker 2 (00:55:05):

Perspective? Yeah,

Speaker 4 (00:55:06):

My bad. I'm sorry for cutting you off.

Speaker 2 (00:55:08):

No, no, that's fine. Uh, we're on, we're on, we're doing this remotely. So oftentimes this kind of works out that way. So how does, how did that start off?

Speaker 4 (00:55:17):

Okay. It is in my perspective, I just get a text saying, this is what you have to do this today. I don't know when the contract is signed. I don't know what Ms. Tabitha negotiated about. I don't know the date.

Speaker 2 (00:55:33):

Okay. It could have

Speaker 4 (00:55:34):

Been,

**EXHIBIT DAR016 - Page 75**

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (00:55:35):

Lemme ask this question. Does that text come before there's any context? Do you have any idea that you had a Dr. Pepper deal prior to receiving that, that text? Or is that the first time you learned there's a Dr. Pepper deal? Shiloh, you need to go out today and shoot this video?

Speaker 4 (00:55:51):

No, they would tell me in advance, but still, even with texting me, I have stuff going on in real life. So it's not just about deals. Like even <inaudible> playing football, that's where my brain is at. So even if I get a text, they tell me that today. I don't remember none of that stuff. I don't, I don't remember a play. If you, if you call the same place we've got, I could tell you football stuff, but

Speaker 2 (00:56:21):

I understand you have a team that's managing this for you. So, uh, does your, does for instance, does Dr. Pepper approach your team first? Is that how that would work?

Speaker 4 (00:56:31):

I don't know who they approach.

Speaker 2 (00:56:32):

Okay, but it's not you. Correct.

Speaker 4 (00:56:34):

Which is who they don't reach out to me exactly. I don't know. Like this is above, this is above me right here.

Speaker 2 (00:56:43):

Okay. Well I'm just under trying to understand your perspective from how these deals. So you're saying that Dr. Pepper does not approach you or in this instance Dr. Pepper did not approach you and say, Mr. Sanders, we'd like to do, uh, deal with you. Correct. So

Speaker 3 (00:56:58):

You think that that mischaracterizes a bit, what he said is he doesn't know who approaches who just that Dr. Pepper didn't, you know, call up Shiloh directly.

Speaker 2 (00:57:07):

Okay. Is that true, Mr. Sanders?

Speaker 4 (00:57:10):

Yes.

Speaker 2 (00:57:10):

Okay. Okay.

Speaker 3 (00:57:12):

EXHIBIT DAR016 - Page 76

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Uh, hold on just one quick second. I apologize. I didn't need to go around how court,

Speaker 4 (00:57:16):

Let me see what it's on. Yeah,

Speaker 3 (00:57:34):

You can go ahead.

Speaker 2 (00:57:36):

Okay. So for in this, in the, in our example here, which is the Dr. Pepper NIL deal that you recently had, who from your team approached you with the Dr. Pepper deal?

Speaker 4 (00:57:50):

Who approached me with the Dr.

Speaker 2 (00:57:51):

Who was the first person? Yeah.

Speaker 4 (00:57:54):

Georgie.

Speaker 2 (00:57:55):

Georgie, okay. From Back Entertainment, correct?

Speaker 4 (00:57:58):

Yes.

Speaker 2 (00:57:59):

And I assume their first question is, do you want to do a deal with Dr. Pepper some, something along those lines? Correct.

Speaker 4 (00:58:08):

I'm not gonna lie, I have no clue anything how this stuff goes. I just do it. I just do what they tell me to do.

Speaker 2 (00:58:15):

Okay. How long ago did you shoot the Dr. Pepper? Um, ad if, if we can call it that?

Speaker 3 (00:58:23):

I, I think this is one of the specific dates that we're gonna be getting for the, um, chapter seven <inaudible>.

Speaker 2 (00:58:29):

This transcript was exported on Jan 17, 2024 - view latest version here.

Well, I'm just trying to, I'm just trying to get a general understanding. Was it, this was like probably within the last few weeks, correct?

Speaker 4 (00:58:38):

It was the same time. Um, it conference championship games, because that's what I said in that ad. So the conference championship games and college football, that's around the time that it went live.

Speaker 2 (00:58:53):

Okay. And that is that, you know, correct me if I'm wrong, is that the week after Thanksgiving?

Speaker 4 (00:59:00):

I don't know, sir. I've been going <inaudible> day. I've been having a great time since football season ended <laugh>.

Speaker 2 (00:59:06):

Okay. Okay. So the only, the only thing you recall about this Dr. Pepper deal before you shot the video was receiving a text from Georgie saying this is what you need to do. Do you remember anything else about the Dr. Pepper commercial that you shot?

Speaker 4 (00:59:28):

Are you saying like, getting the deal or actively shooting it?

Speaker 2 (00:59:32):

Uh, everything other than shooting it? Do you, do you remember anything else other than shooting it, getting the deal, agreeing to the deal, anything like that?

Speaker 4 (00:59:47):

Alright, can I just give you an example on how it is so you can underst understand? I love Yeah, hold on a

Speaker 2 (00:59:55):

Second. Yeah, and I'm not trying to trick you, I'm just trying to understand how these deals work. When I was a college student athlete, we didn't have NIL deals, so this is all new to me. What, what

Speaker 4 (01:00:03):

Sport did you play?

Speaker 2 (01:00:05):

Well, we can get into that some other time. I don't think, we don't wanna waste that anyone's time with that, but

Speaker 4 (01:00:09):

<laugh>, so if I'm like, oh, by the way, like we just have a regular conversation. By the way, you have, um, Dr. Pepper soon, Dr. Pepper's

EXHIBIT DAR016 - Page 78

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (01:00:20):

Coming up and, and just hold on a second. In this example, you're Georgie and I'm you, is that correct?

Speaker 4 (01:00:26):

Georgie? Anyone from Smack? If it, if it is a deal, hey, um, Dr. Pepper's coming up, well pull out a surprise for you. Um, yeah, Dr. Pepper, it is like that. Like, and then I'm like, okay, when, um, when is it? Then she might say, well, we need to come up with dates, we need to get the dates. Then they'll ask me the date and it's like, when, when can you do this? When can you do this? When are you free? Something may come up, we may have to reschedule. So to me, like when I actually do it, that's like when I'm actually doing it, the contracts and stuff, what happens behind closed doors, I have no clue.

Speaker 2 (01:01:03):

Okay. Um, so do they ask for your approval before these, because I assume that there are probably brands that you would refuse to work with. Can't imagine what those are, but I'm sure there are some brands out there that you would prefer not to work with. Um, so I'd assume that they would have to have present a deal to you first and you okay it, right.

Speaker 4 (01:01:24):

That's a good question. I'm not sure it happens like that though.

Speaker 2 (01:01:28):

Okay. But they, they contact, I mean, I'm sure when they contact you then for the first time you could say, no, I'm not, I'm not doing a deal with Dr. Pepper, I can't stand Dr. Pepper. Is that something that could happen?

Speaker 4 (01:01:40):

It could.

Speaker 2 (01:01:41):

Okay. So all, so do you nego, do you know who on your team negotiates the deal with Dr. Pepper, for instance?

Speaker 4 (01:01:54):

The exact deal negotiating? I am not sure exactly who does it, so I don't want to give you the wrong person. Okay.

Speaker 2 (01:02:03):

Um, does Ms. Plummer then work with SMACK Entertainment, I mean work, not work for Smack Entertainment, but do they work together in putting your deals together, reviewing the contracts, making sure everything looks okay?

Speaker 4 (01:02:19):

Yes.

EXHIBIT DAR016 - Page 79

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (01:02:20):

Okay. And do you ultimately sign those contracts?

Speaker 4 (01:02:24):

Yes, I do.

Speaker 2 (01:02:25):

Okay. And is the, are you signing on behalf of, was it big 21 LLC?

Speaker 4 (01:02:36):

I'm not sure.

Speaker 2 (01:02:37):

Okay. But all the money for those deals comes through Big 21, correct?

Speaker 4 (01:02:45):

All the money goes through, gets paid at Big two one?

Speaker 2 (01:02:49):

Yes. Is that correct?

Speaker 4 (01:02:51):

Yeah.

Speaker 2 (01:02:52):

And any money that gets paid out to your managers or, uh, at Snack Entertainment or to Ms. Plummer get paid outta that big 21 account? Correct.

Speaker 4 (01:03:04):

Um, I am not exactly sure about all the details of that.

Speaker 2 (01:03:10):

Okay. And you said sometimes it's random, sometimes it, there are amounts that you have to pay outta the big 21 and sometimes it comes out of the payments before it gets to the big 21 account, correct?

Speaker 4 (01:03:21):

Yes. Sometimes it, um, sometimes they already take it out. Sometimes I have to do it.

Speaker 2 (01:03:27):

Okay. And can you give me an example of do you know of what you were paid for, for instance, this Dr. Pepper add?

Speaker 3 (01:03:42):

EXHIBIT DAR016 - Page 80

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

So I think this is a situation where we would prefer to go and look at the specifics. Um, and we'll certainly provide that information to Mr. Rodriguez and Mr. Wadsworth. Um, it, but I, I think that that will be the most efficient way forward, particularly given that Dr. Pepper may have been a post petition reference prejudicial.

Speaker 2 (01:04:04):

Okay. I just wanna get a sense for what you're paid on these NIL deals, do they vary greatly or are they pretty consistent in how much they pay? Do you have any idea sitting here today?

Speaker 4 (01:04:16):

Very, very inconsistent is, is one month you might make a lot of money. Then the other one, the rest of the months you might not like, you don't know, it's not set, it's not like a job, like a salary. It's just really kind of random. Like I just would wake up one day, then George you might call me with a D deal. I don't know certain things. Okay.

Speaker 2 (01:04:42):

Like that. I'm asking something actually a little bit different. I'm not asking your income month to month. I'm asking actually deal to deal. So one IL deal, one NIL deal versus another NIL deal. Are, is the income that you receive from those deals usually pretty similar or is does that vary significantly? It

Speaker 4 (01:05:02):

Varies. It varies. It varies.

Speaker 2 (01:05:04):

Okay.

Speaker 5 (01:05:09):

Um,

Speaker 2 (01:05:12):

Uh, according to your amended petition, it looks like, uh, for 2022 you had income of about $216,000. Does that sound about correct?

Speaker 4 (01:05:25):

I'm not sure the exact number.

Speaker 2 (01:05:27):

Okay. Well that's the number that you have in your petition. Um, what percentage of that came from do you think came from NIL tails?

Speaker 4 (01:05:37):

I'm not exactly sure. Okay. I can't give number percentage if I'm not sure.

Speaker 2 (01:05:42):

EXHIBIT DAR016 - Page 81

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Okay. What other sources of income do you have other than the NIL deals and, um, those, the headache merchandise that we talked about?

Speaker 4 (01:05:57):

Um, you're right, NIL

Speaker 2 (01:06:05):

Is that those are the only two sources of income for you.

Speaker 5 (01:06:09):

Here's the color stipend too, right?

Speaker 4 (01:06:12):

Yeah.

Speaker 5 (01:06:13):

Uh, so Mr. Sanders also receives a stipend from cu.

Speaker 2 (01:06:19):

Okay. And is that part of your, is that stipend part of your scholarship or is that something different?

Speaker 4 (01:06:24):

Part of the scholarship.

Speaker 5 (01:06:25):

Okay.

Speaker 2 (01:06:28):

Do you receive any additional payments from the University of Colorado or from the sports programs?

Speaker 4 (01:06:34):

No.

Speaker 5 (01:06:35):

Okay. Okay.

Speaker 2 (01:06:41):

So sitting here today, you think most, if not all of the income you reported for 2022 was from NIL deals. Is that correct?

Speaker 4 (01:06:49):

Yes.

EXHIBIT DAR016 - Page 82

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (01:06:50):

Okay. And so that would be the same for your income, you reported for 2023 this year, correct?

Speaker 4 (01:06:58):

Yes.

Speaker 5 (01:06:59):

Okay.

Speaker 2 (01:07:11):

How do you pay for the rent at your apartment? I guess maybe not. How, what, let me ask that a different way. Where does, where does the money come from that you pay to cover the rent for your apartment? Does that come out of your big two one, uh, account or is that somewhere else?

Speaker 5 (01:07:35):

Um,

Speaker 4 (01:07:38):

It would, it would come out of the, what's it called, the big two one, like the where it says paid to, it comes out of there.

Speaker 2 (01:07:54):

Okay. So as part of your college scholarship, you received money in order to pay rental expenses, correct?

Speaker 4 (01:08:02):

I don't know exactly.

Speaker 2 (01:08:03):

Some of your rent is covered by your college scholarship, is that correct?

Speaker 4 (01:08:09):

It's, I don't think it's for rent. I think it's just for living, like the cost of living here.

Speaker 2 (01:08:13):

Okay.

Speaker 4 (01:08:14):

I don't think it's for rent though. I think it's just like, okay, this is how much a person would need to live if they live here.

Speaker 2 (01:08:22):

EXHIBIT DAR016 - Page 83

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Yeah. And does that money from your college, I guess we're calling it college stipend, does that go into your Shiloh Sanders account or into your big two one account

Speaker 4 (01:08:33):

That gets deposited into my business account.

Speaker 2 (01:08:36):

To your big two one account? The big two one LLC?

Speaker 4 (01:08:39):

Yes.

Speaker 5 (01:08:40):

Okay.

Speaker 2 (01:08:41):

So even the money that you received from the university for your college scholarship goes to your big 21 LLC account, correct.

Speaker 4 (01:08:50):

To the, uh, business? Yeah, me too.

Speaker 2 (01:09:17):

Okay. Let me just check some more notes. I think I have a good understanding of the income that's coming in. Um, uh, I just wanna touch in the, the jewelry real quick because you had made an amended petition this morning. I think it was your testimony earlier. I don't recall. But you said that you don't own any jewelry or at least you don't, own any jewelry of any, um, anything more than nominal value. Would that be correct?

Speaker 4 (01:10:01):

Yeah, I don't order, I don't own that one piece of jewelry with that exactly like a gun.

Speaker 5 (01:10:05):

Okay.

Speaker 2 (01:10:10):

And I think you testified before you don't have a credit card, is that right?

Speaker 4 (01:10:14):

No, I don't.

Speaker 2 (01:10:18):

EXHIBIT DAR016 - Page 84

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Uh, how do you pay for, I mean, just as an example, if you were to go to the grocery store, how would you pay for items from the grocery store?

Speaker 4 (01:10:28):
I'd use the money that I paid myself.

Speaker 2 (01:10:31):
Okay. So you'd use money out of the big 21 account? Correct.

Speaker 4 (01:10:35):
Either that or I would use money, like if it is like a business dinner.

Speaker 2 (01:10:43):
Yeah. Uh, so I mean, I guess more specifically, would you, you don't have a credit card to make that payment, you obviously aren't using cash. Are you using like Apple Pay or are you using something else to make those payments?

Speaker 5 (01:10:56):
Using cash or you using debit card? Are you using, like how

Speaker 2 (01:11:00):
Do you physically pay, like how do you physically pay for, like if you went to the grocery store and bought some Ben and Jerry's ice cream 'cause it felt like some ice cream, how would you pay, how would you pay for that as you walked out the door?

Speaker 4 (01:11:11):
Um, I might have some cash. Might use my card.

Speaker 2 (01:11:19):
You might use your card. Is that what you said? Like a debit card?

Speaker 4 (01:11:23):
Yeah, debit card, maybe

Speaker 2 (01:11:25):
Cash. Okay. So you have debit cards, is that correct?

Speaker 4 (01:11:29):
Yeah.

Speaker 2 (01:11:30):
Okay. And are those de debit, is that a debit card that's connected to your big 21 account

EXHIBIT DAR016 - Page 85

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (01:11:36):

Or your personal account? Alright, so I think we can do this with you.

Speaker 2 (01:11:41):

Okay, well how, how I'll clear it up.

Speaker 4 (01:11:44):

Can I speak directly?

Speaker 2 (01:11:46):

Yes, please. Alright,

Speaker 1 (01:11:56):

Mr. Miller, how much more do you think you have?

Speaker 2 (01:11:58):

Um, I just wanna ask, um, five minutes probably. Okay,

Speaker 1 (01:12:04):

Good. Okay, thanks. And then Simon, do you have more afterwards?

Speaker 2 (01:12:07):

I do. Just very, very brief. Okay. Very, very brief.

Speaker 1 (01:12:10):

Good. Mr. Raphael, you turned your camera on. Do you have some additional questions? No. Okay.

Speaker 2 (01:12:23):

I, no <laugh>. Okay. I was gonna ask actually if my, uh, my, I do, but my associate Alexis Weber, if she could just do it and it'd be very brief. Okay. Best in fine. That's

Speaker 5 (01:12:31):

Fine. Be fine. That's fine.

Speaker 2 (01:12:54):

Okay. I think we've figured out the best way to clarify. Okay. So we went to the grocery store, we wanna buy some ice cream, how do we pay for it?

Speaker 4 (01:13:03):

Okay. So it would either be out of my own money or it'd be out of cash. That's how I would pay for stuff at the grocery store.

Speaker 2 (01:13:18):

This transcript was exported on Jan 17, 2024 - view latest version here.

Okay. When you say out of your own money, where does that come from? Is that, I guess, is that via a debit card that you're using there? Like,

Speaker 4 (01:13:30):

Like the source of the payment? What do you mean?

Speaker 2 (01:13:32):

Yeah, the source. The source of the pay, yeah. How that transaction is happens.

Speaker 4 (01:13:38):

It'll be on card or Apple Pay.

Speaker 2 (01:13:41):

Okay. And is Apple Pay, is that connected to your big 21 account?

Speaker 4 (01:13:47):

Yes, I have a card with that account and I have a card with my personal account, but my, um, in the big two one account that I paid myself, I would use it at, I would use the portion that I paid myself. I wouldn't just use the whole account.

Speaker 2 (01:14:03):

I your, how about you? Yeah.

Speaker 4 (01:14:06):

Yeah.

Speaker 2 (01:14:09):

Okay. So Ms. Riley just said something that she said that accountant determines how much like you are paid out of your big 21 account, correct? Yes. So that's basically how much of the money that's in that account you are allowed to spend. Is that another way of saying that?

Speaker 4 (01:14:24):

Yes. Okay.

Speaker 2 (01:14:25):

And I assume because there are some monies in that account that go to pay other people, correct.

Speaker 4 (01:14:33):

In which one,

Speaker 2 (01:14:34):

In your big 21 account?

EXHIBIT DAR016 - Page 87

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (01:14:36):

Yes.

Speaker 2 (01:14:37):

And for instance, some of those are, uh, snack entertainment, they would need to be paid for some of their work. Correct?

Speaker 4 (01:14:43):

Indeed.

Speaker 2 (01:14:44):

Okay. And then I assume there are other people that you hire when you do these videos. Uh, I think earlier you mentioned maybe a hairstylist, makeup artist or something like that?

Speaker 4 (01:14:55):

Yes.

Speaker 2 (01:14:55):

Okay. And that would come out of the big 21 account, correct?

Speaker 4 (01:15:01):

Um, I'm not sure exactly. Okay. So

Speaker 2 (01:15:05):

You have a debit card attached to the big 21 account, correct?

Speaker 4 (01:15:11):

Wait, is he asking, is he asking, are you talking about overall that account?

Speaker 2 (01:15:15):

You, you have a debit card that says Big 20, that, that when you use that debit card, it takes money out of the big 21 account? Correct?

Speaker 4 (01:15:25):

The big 21 LSD? Yes.

Speaker 2 (01:15:27):

Yeah. Okay. And do you have another separate debit card that takes money out of your personal account?

Speaker 4 (01:15:34):

No. Okay.

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 2 (01:15:36):

So that was

Speaker 4 (01:15:36):

Apple Pay,

Speaker 2 (01:15:38):

That's, that's on your Apple Pay?

Speaker 4 (01:15:40):

Yeah. I don't know where that card is.

Speaker 2 (01:15:42):

Okay. So when you use Apple Pay, that takes money out of your account with Wells Fargo, that's in your personal note, is that correct?

Speaker 4 (01:15:56):

Different cards on there on Apple Pay.

Speaker 2 (01:15:59):

Okay. Uh, so do you have two different cards on Apple Pay?

Speaker 4 (01:16:04):

Yes, I have two different cards on

Speaker 2 (01:16:05):

Apple Pay. Okay. And one is a personal card and the other one is a big two one a card. Is that correct?

Speaker 4 (01:16:11):

Yes.

Speaker 2 (01:16:12):

Okay. Okay. And you know, I'm sorry to beat this kind of to a dead horse, but how do you decide which of those cards to use when you pay for something using Apple Pay?

Speaker 4 (01:16:31):

Which one? I have like money in.

Speaker 2 (01:16:34):

Okay. Okay. I just have one more set of questions. Um, I understand your dad now has a show on Amazon Prime of Coach Prime, something like that? You know what I'm talking about?

Speaker 4 (01:16:52):

EXHIBIT DAR016 - Page 89

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

I don't, I don't know exactly what it's on.

Speaker 2 (01:16:55):

Okay. But your dad has a television program on one of the streaming services, correct?

Speaker 4 (01:17:01):

It's not a television program. I think it's a documentary.

Speaker 2 (01:17:04):

Okay. It's a documentary. Okay. And you've appeared on that documentary Documentary, correct?

Speaker 4 (01:17:10):

I am one of a documentary.

Speaker 2 (01:17:11):

Okay. Were you paid for your appearance on that documentary?

Speaker 4 (01:17:18):

Can I ask for if I was paid for that? Uh, I think that would be a

Speaker 6 (01:17:22):

Question more specifically for somebody at his business management

Speaker 4 (01:17:25):

Team.

Speaker 2 (01:17:26):

Okay. So sitting here today, you don't know if you were paid for that or not?

Speaker 4 (01:17:32):

I'm not sure.

Speaker 2 (01:17:33):

Okay. But somebody at, uh, snack Entertainment or Ms. Plummer would know the answer to that question? Correct?

Speaker 4 (01:17:40):

Yeah.

Speaker 2 (01:17:41):

Okay. Okay. I think that's all I have.

Speaker 1 (01:17:46):

This transcript was exported on Jan 17, 2024 - view latest version here.

Um, okay. Thank you. Ms. Weber, do you or Mr. Raphael, do you wanna ask a few questions?

Speaker 6 (01:17:55):
Yeah. Hi. This shouldn't take too long. Okay. So in regards to like the Instagram, TikTok, TikTok, YouTube threads, you make money separately aside from ads. Do you,

Speaker 4 (01:18:13):
Can you answer, can you ask that one one more time please?

Speaker 6 (01:18:16):
Yeah, so how you have like ads on Instagram, TikTok, YouTube, all that stuff, how you make money with like a brand, but you make money separately just because of like the amount of following that you have and use you get on things, right?

Speaker 4 (01:18:30):
I do not understand that. I'm so sorry.

Speaker 6 (01:18:33):
So because of the following you have on Instagram or YouTube or TikTok, do you make money just from having a following on there and getting a lot of views and interactions and engagement on your content?

Speaker 4 (01:18:47):
Oh, just, just of the page by itself? Like Yeah, just the pieces of the page?

Speaker 6 (01:18:53):
Yeah.

Speaker 4 (01:18:56):
I don't know if it works like that.

Speaker 6 (01:18:59):
I'm pretty sure once you have like a certain amount of following, then you get paid for that as well. You don't know, you've never seen like a check from Instagram, YouTube, uh, TikTok,

Speaker 4 (01:19:11):
Just having followers?

Speaker 6 (01:19:13):
Yeah. And like a high engagement,

Speaker 4 (01:19:19):

EXHIBIT DAR016 - Page 91

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

I don't know. I don't know what you're referring to. I, I honestly do not know. I don't think that, I don't know.

Speaker 6 (01:19:29):

Okay. It doesn't make sense. What, go ahead. You just said that doesn't make sense. Okay. So what about your music on YouTube? Do you monetize off of that?

Speaker 4 (01:19:47):

Does my music monetize on YouTube?

Speaker 6 (01:19:49):

That's what I asked. Yeah.

Speaker 4 (01:19:52):

Only I do have some music on YouTube. YouTube music videos. Um, I think it Monet, I don't think it makes anything, but yeah.

Speaker 6 (01:20:04):

Do you have your music on Spotify?

Speaker 4 (01:20:07):

No, I don't have any music on Spotify. If I recall correctly. I don't think I have anything on Spotify or Apple Music.

Speaker 6 (01:20:16):

So the YouTube music, you don't make any money off of that, you just do it for fun.

Speaker 4 (01:20:22):

It's not YouTube music. I have two videos, this is off my recollection right now, but I'm under oath and I'm not trying to tell y'all the wrong thing. So YouTube, I have two music videos on there,

Speaker 6 (01:20:37):

Right?

Speaker 4 (01:20:38):

And they run ads on them, so that means <inaudible>.

Speaker 6 (01:20:44):

So you know that they do monetize then your YouTube does, Monet does make money aside from like just a brand collaboration or something like that.

Speaker 3 (01:20:55):

EXHIBIT DAR016 - Page 92

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

So again, just to interject, just to, again, I think clarify because I think this is maybe mischaracterizing this testimony. Your prior question was whether or not he was getting paid by Instagram, TikTok or YouTube just for Havo followers. Whereas this question is whether the video was monetized based on the ads that are run on it. So I think that those are two different things.

Speaker 6 (01:21:17):

Sure. Well, he said before that he didn't, he had no idea you could get paid off of those different social medias. So

Speaker 3 (01:21:24):

If, if the question is specific as to YouTube and if he gets paid from ads run on the YouTube page, then I think we need to clarify that that is the question that he's answering.

Speaker 6 (01:21:34):

Okay. So you get paid from the AdSense, like on YouTube. So where would that money go?

Speaker 4 (01:21:43):

So I'm not sure what accounts set up with it, but one of my accounts

Speaker 6 (01:21:49):

Is that something your attorney could provide?

Speaker 4 (01:21:53):

Can you <inaudible> can you hear me?

Speaker 6 (01:21:56):

Yeah,

Speaker 4 (01:21:57):

Can you repeat that one more time?

Speaker 6 (01:21:59):

I said is that something your attorney can provide if you don't know where your money is going from your YouTube ads?

Speaker 3 (01:22:07):

I we can certainly look into that. I'm certain that the chapter seven trustee is potentially interested in that information as well. Um, and in fact that may be a little list of Mr. Rodriguez's follow up questions. So we'll certainly provide that to them.

Speaker 4 (01:22:19):

Yeah, and that's not no type of money that y'all be interested in.

Speaker 6 (01:22:27):

EXHIBIT DAR016 - Page 93

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Um, so the name image likeness, like for example, the Medi Quest thing you had on your story today. Do you have like, okay, I need to post three times on my story, three Instagram posts, for example, and then get paid a certain amount for that amount of posts? I know it varies. Every brand, every different kind of post with a different brand is different. But how, for example, Medi Quest one since it was today, how does that work?

Speaker 4 (01:22:58):

Uh, I have, that was a long question. I'm answering how does it work? How do I know if I have to post something right now? So there is deliverables that you have to do for a certain deal. So if I sign a deal with you, I might have to post three things. Mm-Hmm, <affirmative> those, you might want those three things posted at different times,

Speaker 6 (01:23:21):

Right?

Speaker 4 (01:23:22):

So in one deal you have to post all those times. So I posted that today, but I, I actually posted that another day, but I have another deliverable I have to post it on my story

Speaker 6 (01:23:37):

For. Yeah. So for example, with Medical Quest, specifically this brand deal that you have, how many times do you have to post in order to get paid?

Speaker 4 (01:23:50):

That's not a good question for Shalon.

Speaker 6 (01:23:55):

So when you did whatever contract, your manager, whoever say says, Hey, you need to post for me request today on your Instagram story, how many times do you have to post specifically, like with MedQuest talking about MedQuest on your story or whatever to get that check for your partnership with MedQuest?

Speaker 4 (01:24:18):

I don't know exactly, but I know Georgie asked me a lot through our other data post <laugh>.

Speaker 3 (01:24:23):

And, and specifically as it relates to MedQuest, I do just want to clarify that again. Is a post-petition contract as well and not a pre-petition contract.

Speaker 6 (01:24:32):

Okay. So, um, in regards to like posting, let me rephrase that. I, so when you're posting on your Instagram and then your TikTok and your other things, are those brands like asking you to post on multiple platforms in one contract or is it separate things?

EXHIBIT DAR016 - Page 94

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (01:25:01):

The details? I'm not the details guy. I'm just the football guy and a student. I, they, I just do exactly what they tell me to do.

Speaker 6 (01:25:09):

So you just do what you're told and then you get money in your bank account. So does this all go to the same bank account that you were talking about earlier?

Speaker 4 (01:25:21):

To the, to which one? So

Speaker 3 (01:25:23):

Can you clarify if it goes to the big 21 account or your personal account?

Speaker 4 (01:25:27):

Big 21 account,

Speaker 6 (01:25:29):

All of like the name image likeness stuff,

Speaker 4 (01:25:33):

Business stuff goes to the business account.

Speaker 6 (01:25:37):

So would you consider that to be the name image likeness, like the ads on social media? I

Speaker 3 (01:25:43):

Think on several occasions now that the money from all of these deals is going into the big account.

Speaker 6 (01:25:51):

I was just clarifying. Thank you for your help. Um, gimme one second.

Speaker 5 (01:26:02):

I

Speaker 6 (01:26:31):

So for that headache website with the merchandise that you sell, that also goes into the same bank account too?

Speaker 4 (01:26:39):

Um, nothing goes to my bank directly from that website. It goes to the guy that sells it and then he sends it to me.

**EXHIBIT DAR016 - Page 95**

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 6 (01:26:49):

Okay. And then

Speaker 4 (01:26:51):

He But to the big 21

Speaker 6 (01:26:53):

Sorry, go ahead. What did you say?

Speaker 4 (01:26:55):

Anything? Anything? Business goes to business.

Speaker 6 (01:26:58):

Okay. And then business. What'd you say?

Speaker 4 (01:27:03):

Anything? Business goes to business and business is Big two, one.

Speaker 6 (01:27:09):

Okay. And then for the jewelry, I know you said that was, um, rented. So did you rent like the jewelry with your name on it?

Speaker 4 (01:27:20):

Well, nobody said it was rented. To

Speaker 3 (01:27:21):

Clarify it was loaned.

Speaker 6 (01:27:23):

Loaned. Okay. So you were loaned the jewelry with your name on it.

Speaker 4 (01:27:31):

Say if I was like, Hey, I want you to post my drink here, um, take a picture with this drink that I just gave you here, here and there, and you can have a, a drink.

Speaker 6 (01:27:42):

Mm-Hmm. <affirmative>.

Speaker 4 (01:27:45):

Yeah. But then if I'm like, all right, hold on, I'm gonna give you another drink, can you send me that drink back so I can give you something else? It's like a loaner. It's like you don't own it. So. Okay. If, if I may, can I just ask what's the collateral on the loan loan? If your loan jewelry, what's the collateral on the loan?

EXHIBIT DAR016 - Page 96

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 3 (01:28:05):

Like, do you have to give them something for them to spend you a piece of jewelry

Speaker 4 (01:28:10):

Promise? What's the promise Ads? What ads do you have to give them in colla in response to that jewelry that they loan to you? Promo? Is it specifically for that jewelry company? I, I tag like I would tag 'em if I take a picture and we wearing it. Anytime I wear it on a photo I have to tag. And the jewelry that they gave you, is it in your name? Is it in the shape of your name? Yes. Okay. And it says Shiloh in Diamonds, correct? I don't know what it is. It does not say Shiloh and Diamonds. It says Shiloh, but I don't

Speaker 3 (01:28:52):

It. Yeah, I think he doesn't know if it's diamonds or

Speaker 4 (01:28:55):

Not Diamonds. The jewelry you wore on the Sports Illustrated cover, is that your jewelry or is that loan to you as well?

Speaker 4 (01:29:03):

Oh, I know what you're talking about. So one of those chains my dad actually gave, he put on me before the game. So that's his chain. There's a video of him putting that chain on me. It's a 21 chain and the, um, there's a gold and diamond cross that I was wearing a jeweler. Uh, one of my older brothers' jewelers came up to me before the game and I said, this is how it happened. 'cause y'all don't believe me, this is how it happened. I'm like, dang, it changed. He didn't let me get that one. I'm finna wear that. And then he just took it off and 'cause he, he is a jeweler, so his promo was wearing a lot of chains. So I'm like, I want that one, then I just wear it.

Speaker 3 (01:29:47):

Did you have to return it?

Speaker 4 (01:29:50):

No, I didn't have to return it, but whenever they sell it, whenever they sell it, then I have to return it and they'll probably gimme another chain, you know what I'm saying?

Speaker 2 (01:29:58):

Who's they? Who's still the owner? I still don't understand

Speaker 4 (01:30:01):

The jewelers. Like I don't buy, I'm just like, I just wear it.

Speaker 2 (01:30:07):

Okay. Um, you have another video on YouTube where you were driving a Mayback truck? Whose Mayback truck is that?

EXHIBIT DAR016 - Page 97

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (01:30:16):

I don't recall. Oh, that

Speaker 2 (01:30:18):

I can't share my, I don't know if I can share my screen, but, um, you did post a video of you driving a Maybach truck on,

Speaker 4 (01:30:25):

I don't think

Speaker 2 (01:30:26):

It, uh, hold on. Here was Shiloh Sanders in a Maybach truck on April 3rd, 2023? Do you recall that?

Speaker 4 (01:30:34):

I don't think it is true.

Speaker 2 (01:30:36):

All right. Um, when you spent $50,000 at a Louis Vuitton store, who gave you the $50,000 to spend? Was it yours or was it I

Speaker 3 (01:30:44):

Perfect. I'm just gonna interject. And had it actually been established that he spent the third, the 50,000

Speaker 2 (01:30:50):

Okay. Testimony.

Speaker 3 (01:30:53):

He was just pooping around,

Speaker 2 (01:30:56):

So he spent the money there. Okay. Just making sure. Penny,

Speaker 4 (01:30:59):

Why'd you say that? Why'd he say that? Hold on.

Speaker 2 (01:31:02):

Just, well, what do you mean?

Speaker 3 (01:31:05):

So

Speaker 2 (01:31:06):

I,

EXHIBIT DAR016 - Page 98

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 ([01:31:06](#)):

He was just making a statement shallow. He didn't ask you a question.

Speaker 2 ([01:31:09](#)):

Oh. Um, okay. And then you were asked earlier about the lawsuit that brings us here or the original judgment by, uh, John Dejan. Let me just rephrase the question that was asked to you. So are you aware that there is a judgment against you for over $11 million?

Speaker 4 ([01:31:29](#)):

I'm aware of a judgment, yes.

Speaker 2 ([01:31:32](#)):

Um, are you aware that John Daron had his spine broken?

Speaker 4 ([01:31:40](#)):

I'm not aware of anything that he says because it's probably not true. I don't know. I,

Speaker 2 ([01:31:52](#)):

During that lawsuit, I mean, in Texas did you have an attorney?

Speaker 3 ([01:31:59](#)):

At what point during the lawsuit,

Speaker 2 ([01:32:01](#)):

At any point during the lawsuit did you have an attorney?

Speaker 4 ([01:32:06](#)):

I think was there different lawsuits or was it just one? Just one. The ones where I had the attorney? Yes. Yes. Then I, yeah.

Speaker 2 ([01:32:14](#)):

Before the age of 18, did you have an <affirmative> in that lawsuit?

Speaker 4 ([01:32:23](#)):

You're asking some tricky questions. I do not remember, but I think

Speaker 2 ([01:32:27](#)):

After you it's all right. After you turned 18, did you have an attorney in that lawsuit?

Speaker 4 ([01:32:33](#)):

I'm not sure the dates.

Speaker 2 ([01:32:35](#)):

EXHIBIT DAR016 - Page 99

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Did you take a deposition in that lawsuit?

Speaker 4 (01:32:38):
Yes, I took a deposition.

Speaker 2 (01:32:40):
I did. Did you have an attorney with you when you took that deposition?

Speaker 4 (01:32:43):
Yes.

Speaker 2 (01:32:44):
Did you turn 18 on February 9th, 2018?

Speaker 4 (01:32:50):
Yes.

Speaker 2 (01:32:51):
Did you take that deposition in April 17th, 2018?

Speaker 4 (01:32:55):
I don't know. Okay.

Speaker 2 (01:32:57):
Could we just get the tape? Were you 18 years old in April of 2018?

Speaker 4 (01:33:04):
Yes. Okay.

Speaker 2 (01:33:06):
Um, I believe, oh wait, two more questions. Do you have any ownership in Actively Black? Do yes or no?

Speaker 4 (01:33:13):
No.

Speaker 2 (01:33:14):
Do you have any ownership in Reach the People Media?

Speaker 4 (01:33:18):
No.

Speaker 2 (01:33:18):
Are you paid by Reach the People Media for any viewership that you get on YouTube?

EXHIBIT DAR016 - Page 100

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (01:33:23):

No.

Speaker 2 (01:33:23):

Do you know how much money you make on a video that makes over has a hundred thousand views on YouTube?

Speaker 4 (01:33:29):

Probably like $300.

Speaker 2 (01:33:33):

One more. Um, are you paid directly when you get over a hundred thousand views on YouTube? Who is paid you or, um, S 21?

Speaker 4 (01:33:44):

It don't work like that.

Speaker 3 (01:33:45):

Hold on. S 21 or Big 21?

Speaker 2 (01:33:47):

I'm sorry, I I've got them confused. Um, just the one of your LLCs or yourself personally?

Speaker 4 (01:33:54):

Anything Business with business

Speaker 2 (01:33:56):

In business or business. And um, as we stated, I think earlier people were asking about your team, Ms. Plummer, you don't know if she's your attorney or your agent. Is that right?

Speaker 4 (01:34:05):

I said the testimony.

Speaker 2 (01:34:07):

What's that?

Speaker 3 (01:34:08):

It's not the testimony. Mr. Sanders testified that in his view, a manager and an agent are one in the same and that goes through SMAC Entertainment. Uh, Ms. Plummer, he testified with his attorney.

Speaker 2 (01:34:20):

Okay. Are you friends with Ms. Plummer on Instagram?

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 ([01:34:25](https://www.rev.com)):
Um, I respect her too much to do. Call her my friend. I'd say,

Speaker 2 ([01:34:30](https://www.rev.com)):
Lemme rephrase it. Are you a que are you connections with her on Instagram? A follow up?

Speaker 4 ([01:34:37](https://www.rev.com)):
Do I follow her Instagram page?

Speaker 2 ([01:34:39](https://www.rev.com)):
Yes. Yes. Does she follow yours?

Speaker 4 ([01:34:41](https://www.rev.com)):
Yes. I hope so.

Speaker 2 ([01:34:43](https://www.rev.com)):
You aware on her Instagram page it calls her an agent?

Speaker 3 ([01:34:48](https://www.rev.com)):
Again, we're gonna let Ms. Plummer testify to Ms. Plummer. This is about, okay, Mr. Sanders,

Speaker 2 ([01:34:55](https://www.rev.com)):
His cabin. Mr. Sanders, how many followers do you have on Instagram?

Speaker 4 ([01:34:59](https://www.rev.com)):
Almost a million.

Speaker 2 ([01:35:00](https://www.rev.com)):
Okay. Do you know by having close to a million followers, if you are paid more per view when you share a post because it's closer to a million, is it go up as a, as the more viewers you get

Speaker 4 ([01:35:12](https://www.rev.com)):
It? Actually, I'm trying to tell y'all don't work like that.

Speaker 2 ([01:35:15](https://www.rev.com)):
So, but you do negotiate your deals or you don't negotiate your deals?

Speaker 3 ([01:35:20](https://www.rev.com)):
I think Mr. Sanders has already testified that his team is the one who handles

Speaker 2 ([01:35:24](https://www.rev.com)):
<crosstalk>. No, but he just, Ms. Riley, he just said that it doesn't work like that. So he's gonna educate me because I don't have deals on Instagram. Nobody cares about Orie. Rafael, I post and I get five likes

EXHIBIT DAR016 - Page 102

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

about my dog taco. So I want to know he's a french bulldog. He's cute, but, um, he knows how to post. And so how does the deal work? Can you just tell us that and then that should be the last, I have one more question after that, but can you explain to me how does it work then?

Speaker 4 (01:35:48):

Alright, so, alright. You could actually blow up with the dog on Instagram. You'd have to post the right, right thing. Alright. Number one. Number two, people think that every post that Kim Kardashian posts, she makes a certain amount. Instagram doesn't pay you. Instagram doesn't pay nothing.

Speaker 2 (01:36:10):

Yeah. You make a deal with a, with a brand. A brand pays you to post Correct.

Speaker 4 (01:36:14):

Brand pays you Instagram just 'cause you have a certain amount. 'cause there's people, there's people on the, um, here's an example. There's people on the, on three valuations that's way higher than me and they only have like 20,000 followers. And

Speaker 2 (01:36:32):

It's about engagement, correct?

Speaker 4 (01:36:35):

Yeah. They don't have engagement, but they're still valued higher. So it, it don't work, it don't work like that. Don't, but

Speaker 2 (01:36:40):

You can keep up with on three, is that right? You, you keep up with on three and look at the numbers there.

Speaker 4 (01:36:46):

I've seen 'em before. Mm-Hmm. They make little memes out of that stuff and it don't be true.

Speaker 2 (01:36:51):

So, so along the point that you're making, so if you have a million followers, you can negotiate higher numbers or higher fees for your postings. Right.

Speaker 3 (01:36:59):

And Mr. Sanders has already testified that he's not the one negotiating for these deals and he's already testified that he doesn't agree with the numbers on I three.

Speaker 2 (01:37:07):

I I I'm sorry. Is there a, I dunno if there's a court report on this, but I mean, he's talked about how these deals are done. So he has some understanding of it so he's not totally illiterate to how these deals are done. So what I ask him again is the more, if you have a million followers, will your deals get higher payment compared to what your deals are today?

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Speaker 4 (01:37:26):

Okay. I need you to slow down and just hear me out for a second. Alright?

Speaker 2 (01:37:30):

I'm sorry.

Speaker 4 (01:37:31):

I'm trying to explain it the best I can. There's people valued higher than me and IL that have less followers than me by a hundred thousand, 200,000 less followers. They have like 20,000 followers and have a high valuation on, on on three. It doesn't matter how many followers you have, but each brand is different. They just want the person like you could, I I don't have the most followers in the world. If, if they want all followers, I wouldn't have that many deals.

Speaker 2 (01:38:05):

Mm-Hmm. <affirmative> of all your deals or NIL deals, what's your highest paying one?

Speaker 4 (01:38:16):

Highest paying NILD

Speaker 2 (01:38:19):

If

Speaker 3 (01:38:19):

You

Speaker 5 (01:38:21):

Know?

Speaker 4 (01:38:21):

I don't know. I don't know. I don't know exactly which ones are high. I can't say you the wrong thing and I'm under oath right now. I'm not

Speaker 2 (01:38:28):

Trying to do that. You know how many NI ideals you have though, in total? I know your attorney says she'll get us a list of them, but do you know, happen to know how many you have?

Speaker 3 (01:38:36):

What point are we talking about current in

Speaker 2 (01:38:38):

Total up until today?

Speaker 3 (01:38:41):

This transcript was exported on Jan 17, 2024 - view latest version here.

So I would suggest that petition date NIL deals are what are going to be relevant to the chapter seven trustee.

Speaker 2 (01:38:47):

Okay. So petition date. So your lawyer can, she's helping us. So how many since petition date have you done?

Speaker 4 (01:38:54):

I need her to help me with these numbers 'cause you guys are asking me so many details and I do not know.

Speaker 2 (01:39:03):

But you said earlier you're good with money, right?

Speaker 5 (01:39:05):

I

Speaker 4 (01:39:06):

I'm smart.

Speaker 2 (01:39:08):

Yes you are. So you, you're not tracking that, is that right?

Speaker 4 (01:39:12):

I thought I was smart into this situation. <laugh>.

Speaker 2 (01:39:16):

Alright, we'll we'll have, um, we'll meet again then. Um, thank you Mr. Osworth.

Speaker 1 (01:39:22):

Thank you. Okay, Mr. Rodriguez, let's make it pretty

Speaker 2 (01:39:24):

Quick. Yeah, it's very, very, very quick here. Uh, Mr. Sanders, when did you enroll at the University of Colorado?

Speaker 4 (01:39:32):

When did I enroll the exact date? I do not recall, but I moved there earlier this year.

Speaker 2 (01:39:43):

In 2023?

Speaker 4 (01:39:45):

EXHIBIT DAR016 - Page 105

4875-9945-6161, v. 1

This transcript was exported on Jan 17, 2024 - view latest version here.

Yes.

Speaker 2 (01:39:48):

Um, and when did you start doing NIS with the university, uh, as a student athlete while at the University of Colorado?

Speaker 4 (01:40:00):

When did I, when did I do NIS at

Speaker 2 (01:40:06):

Colorado. So you enrolled at the University of Colorado as a student athlete. The NCAA said that you can do the nis. When did you start monetizing your Nils through the University of Colorado as a student athlete.

Speaker 3 (01:40:28):

So I, I think maybe just to clarify that the deals aren't necessarily through the university.

Speaker 2 (01:40:33):

No, no e exactly. That's why I said as a student athlete, that's why I clarified it.

Speaker 3 (01:40:38):

After you enrolled at cu when did you start doing NIS?

Speaker 4 (01:40:44):

That I do not know exactly.

Speaker 2 (01:40:48):

Did it happen right away shortly thereafter? Later on when

Speaker 4 (01:40:52):

The season started? Um, skip a rough estimate if you can. I don't recall of many deals when I first got there. That's why I be trying to tell you guys. It's on and off. Like you don't have a base salary of how many deals you get every month. The uh, and then do you have any other merchandise deals with any other company? I'm not sure exactly. Okay, Mr. Walters.

Speaker 1 (01:41:27):

Alright, thanks. That will conclude the, um, the meeting of creditors. Carrie, if you would stay on the line and anybody else from your side, I know you wanted to ask me a question about tax returns, but I don't, that's not a public issue. So, um, if the, um, if the, if the creditor side want to hang up, that'd be great. Um, but yeah, the meeting is done. We're off the record.

**EXHIBIT DAR016 - Page 106**

4875-9945-6161, v. 1